In re Johnette TUCKER, Debtor.

Johnette TUCKER, Plaintiff,

v.

MID–PENN CONSUMER DISCOUNT COMPANY, Defendant.

Bankruptcy No. 86–04428S.
Adv. No. 86–1378S.

United States Bankruptcy Court,
E.D. Pennsylvania.

June 18, 1987.

Gary Klein, Philadelphia, Pa., for debtor/plaintiff.

Arthur Matusow, Philadelphia, Pa., for defendant.

Edward Sparkman, Philadelphia, Pa., Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION AND PROCEDURAL HISTORY

Our decision-making process in the instant adversarial proceeding fully illustrates that, as judges, we must interpret the law as we find it, and grant such relief and only such relief as the law allows and that the parties, by their pleadings, amplified by their arguments, may request, rather than what might appear "fair." In the first claim in her Complaint Objecting to Secured Claim and Seeking Damages, filed by the Debtor in this Chapter 13 case on December 3, 1986, the Debtor requests what seems "fair," i.e., a declaration that unearned "service charges," imposed as part of the finance charges in writing a series of loans, should be rebated when the loans are re-financed. However, we must deny this relief because we find that the controlling Pennsylvania state law disallows it. Meanwhile, in her second claim, the Debtor requests substantial monetary relief and a total annihilation of the loan's security as a consequence of her rescission of the last of the series of loan agreements. The wide scope of relief which the Debtor seeks as a result of the practices challenged here, seems, at first blush, excessive and hence not "fair." However, this is precisely the relief which the controlling federal law provides. In fact, the law is so generous that, by taking additional actions and making additional demands which she

has voluntarily foregone, the Debtor could have received even greater benefits under this law than she requests, although we award her only that which she requests. Again, however, we can only provide what the combination of the record made and the application of the law to it allow.

■ Although the instant adversarial proceeding involves fascinating issues of law, we are presenting our Opinion in narrative form, because the parties have commendably presented this matter to us on a brief, eight-paragraph Stipulated Statement of the case, filed March 11, 1987, to which is attached eleven exhibits, and Briefs filed in timely fashion, per our Order of February 19, 1987, on April 1, 1987, and April 22, 1987, plus a Reply Brief filed by the Debtor on May 1, 1987.[1] Hence, we need make no factual findings and we relate hereinafter such stipulated facts as are necessary to make our Opinion comprehensible.

## B. FACTS

On March 12, 1985, the Debtor and, apparently, her husband, William H. Tucker, who is not a debtor (the Debtor and her husband will be collectively referred to hereinafter as "the Borrowers"), made a loan of a net sum of $3,022.07, enhanced to an amount financed of $3,252.50 by charges for life and disability insurance and fees, from the Defendant, MID–PENN CONSUMER DISCOUNT COMPANY (referred to hereinafter as "the Lender"), in a loan transaction written under the Pennsylvania Consumer Discount Company Act, 7 P.S. § 6201, et seq. (hereinafter referred to as "the CDCA"). Pursuant to 7 P.S. §§ 6213 E and 6213 F, the Lender charged the Borrowers "interest and discount" of $1,333.80 and a "service charge" of $94.00,

respectively, the maximum finance charges allowable under this (or any other Pennsylvania) law, resulting in an annual percentage rate of the finance charge (hereinafter referred to as "APR"), properly disclosed pursuant to the federal Truth-in-Lending Act (hereinafter referred to as "TILA"), 15 U.S.C. § 1605, of 25.40 percent. As security, the Lender took a mortgage against the Borrowers' home at 712 South 58th Street, Philadelphia, Pennsylvania 19143, in the amount of $4,680.00, the gross sum payable on the loan. This fact was properly disclosed, and the Lender, also properly, gave the Borrowers notice of their right to rescind the transaction, since security was retained on the Borrowers' dwelling, pursuant to 15 U.S.C. § 1635. The payment terms provided for thirty-six payments of $130.00, a total remittance of $4,680.00.

After making five of the thirty-six monthly payments contemplated by the loan contract, apparently in timely fashion, the Borrowers, for reasons which do not appear of record but which were probably motivated by a desire to obtain the $878.47 in additional funds received at that time, rewrote this transaction on September 3, 1985. The Lender, in calculating the terms of the new transaction, deducted, from a "gross balance" of $4,030.00, rebates of $931.00 of the "interest or discount" and $146.71 of the insurance premiums, utilizing the so-called Rule of 78's, which is authorized by 7 P.S. § 6214 D.[2] No rebate was calculated on that portion of the finance charges which constituted the $94.00 "service charge." This resulted in a net amount borrowed of $3,830.50, to which was added insurance charges and fees totalling $384.70, leaving a new amount financed of $4,215.20. To this was added

---

1. We do caution Counsel, in the future, to contact opposing counsel and the Court before succumbing to the temptation to file an unsolicited Reply Brief. *See In re Jungkurth, Jungkurth v. Eastern Financial Services, Inc.*, 74 B.R. 323, 325–26 (Bankr.E.D.Pa.1987).

2. Actually, 7 P.S. § 6214 D appears to require only that rebates be provided according to a formula which can best be described as "the sum of the monthly balances" method, which, as per correspondence attached to the Lender's

Brief from the Pennsylvania Department of Banking, is even *more* beneficial to a Lender than the Rule of 78's. However, a pertinent Regulation, 10 PA. CODE § 41.3(f), specially requires the Lender to use the Rule of 78's. Thus, the Lender is not being charitable to the Borrowers, as it suggests, by using this formula. *See also* pages 927–28 *infra*; and *Jungkurth, supra*, at 333–34, for a general analysis of the tendency of the Rule of 78's to benefit lenders.

"discount or interest" of $2,644.80 and a new "service charge" of $100.00. The resulting loan required payments over forty-eight months, at $145.00 monthly, or a total remittance of $6,960.00; and the APR was 27.21 percent.

The above translations can be summarized by the following calculations:

| | |
|---|---|
| Original total balance on loan of 3/12/85 | $4,680.00 |
| (Less) Payments (5) | 650.00 |
| Gross Balance | 4,030.00 |
| (Less) Rebates | 1,077.71 |
| (Plus) New money | 878.47 |
| Net amount of loan of 9/3/85 | $3,830.50 |
| (Plus) Charges for insurance, fees | 384.70 |
| Amount Financed | 4,215.20 |
| (Plus) Interest or discount | 2,644.80 |
| (Plus) Service Charge | 100.00 |
| Total of Payments in loan of 9/3/85 | $6,960.00 |
| (Payable in forty-eight installments of $145.00 each). | |

Had the Borrowers carefully reviewed the foregoing calculations, they would have recognized the folly of rewriting this transaction. In order to obtain $878.47 in additional cash, a sum only $228.47 more than the $650.00 that they had paid to the Lender since March, they obligated themselves to make *larger* payments for a year longer, resulting in total additional payments of $2,280.00. We surmise that the Lender was far more aware of this impact of the rewrite of the earlier loan than were the Borrowers.

In the September 3, 1985, transaction, the Lender took, as security, another mortgage in the Borrowers' home, in the amount of $6,960.00, and did not satisfy the previous mortgage. The Lender argues that this "double mortgaging" was disclosed by a recitation on the TILA disclosure statement that the Lender not only took a security interest in the Borrowers' home, but also the following statement: "COLLATERAL SECURING OTHER LOAN WITH US MAY ALSO SECURE THIS LOAN." The lender also provided the Borrowers with a notice of their right to rescind, pursuant to 15 U.S.C. § 1635, which included the following recitation:

You are entering into a new transaction to increase the amount of credit provided to you. We acquired a (mortgage/lien/security interest) (on/in) your home under the original transaction and will retain that (mortgage/lien/security interest) in the new transaction. You have a legal right under federal law to cancel the new transaction, without cost, within three business days

. . . . .

(1) the date of the new transaction is 9-3-85

The Borrowers' failure to appreciate their lack of foresight in writing the original loan was graphically illustrated by their even less well-advised repetition of this conduct on December 3, 1985, when they wished to borrow an additional $2,089.41. The summary of the calculations of this loan, when stated in a form similar to that which we set forth in summarizing the September 3, 1985, loan, is as follows:

| | |
|---|---|
| Original total balance on loan of 9/3/85 | $ 6,960.00 |
| (Less) Payments (2) | 290.00 |
| Gross Balance | 6,670.00 |
| (Less) Rebates (again: only of "discount," not "service charge") | 2,648.66 |
| (Plus) New money | 2,089.41 |
| Net amount of loan of 12/3/85 | 6,110.75 |
| (Plus) Charges for insurance, fees | 697.16 |
| Amount Financed | 6,807.91 |
| (Plus) Interest [3] | 4,592.09 |
| Total of Payments in loan of 12/3/85 | $11,400.00 |
| (Payable in sixty installments of $190.00 each). | |

Again, we observe that the Borrowers received $2,089.41 in additional funds after having just paid $290.00, and thus received a net additional sum of $1,799.41. Yet, the resulting loan required them to make substantially larger payments over another year, resulting in additional total payments of $4,410.00. A comparison between the Debtors' stance on March 12, 1985, as compared to that on December 3, 1985, causes us to observe that, because of receipt of two net additional advances totalling

---

**3.** Because the amount financed was over $5,000.00, the Lender was obliged to utilize a different formula for computing finance charges, per 7 P.S. § 6213 E, which incorporates 7 P.S. § 6609(1). The APR was accordingly reduced to 22.51 percent.

$2,027.88, the Borrowers obligated themselves to pay $6,720.00 more than they had in the original transaction. The properly pejorative designation of the practice of inducing borrowers to rewrite loans as frequently as possible, i.e., "flipping," may well appropriately characterize the conduct of the Lender here.

The Lender took a third mortgage against the Borrowers' home in the December 3, 1985, transaction. The parties have stipulated that, for some reason, the amount of this mortgage was "only" $6,807.91, the amount financed in the transaction, rather than, as would have been consistent with the prior loans, taking a mortgage in the amount of the Total of Payments. However, the parties also stipulated that the two prior mortgages were not satisfied, so that, as a result of these loans, three mortgages totalling $18,447.91 remained of record against the property as of December 3, 1985.

The TILA disclosure statement and rescission notices given to the Borrowers in the December 3, 1985, transaction "disclosed" the status of the security and the Borrowers' right to rescind in the same terms as the document quoted above in the September 3, 1985, transaction, at page 926, *supra*, with the exception of accurately reciting the new date of the transaction.

The Borrowers made nine payments of $190.00, or a total of $1,710.00, towards this last loan. On September 22, 1986, at which time the Borrowers were apparently current on payments, the Debtor filed this Chapter 13 case.

Thereafter, the Debtor, suddenly the wiser for her consultation with competent counsel, on November 13, 1986, by her counsel, wrote a letter in which she "elected to rescind" the transaction of December 3, 1985, on the grounds that both the TILA disclosure statement and the notice of the right to rescind failed to accurately recite the security interest retained. The letter demanded that the Lender return all money paid in the transaction and mark all security interests satisfied within twenty days, per 15 U.S.C. § 1635(b), see page 929 *in-fra*, stating that the Debtor would "undertake to perform" her obligations "[o]nce [the Lender] has completed its obligations under the Act, ..."

On December 12, 1986, the Lender, by its Counsel, responded by a letter in which it stated that the Lender did not intend to take any actions as demanded by the Debtor's letter, because it believed that all disclosures were given correctly and that, consequently, the Debtor had no right to rescind the transaction. This Complaint, seeking damages arising out of the December 3, 1985, transaction only, followed.

## C. THE DEBTOR CANNOT SUCCEED IN HER USURY CLAIM BECAUSE THE APPLICABLE STATE LAW DOES NOT REQUIRE THE LENDER TO REBATE THE UNEARNED "SERVICE CHARGE"

█ In one of the two claims set forth in her Complaint, the Debtor asserts that the Lender was guilty of usury in failing to rebate any portion of the "service charges" imposed in calculating the rebate due in both of the refinancing transactions.

The Debtor undertakes to prove to us that it is unconscionable to calculate refunds under the Rule of the 78's, let alone refusing, as did the Lender, to rebate *any* portion of the "service charge." As our Opinion in *Jungkurth, supra,* 74 B.R. at 332–34, makes clear, we thoroughly understand that any formula other than the "actuarial method" of calculating rebates, unless such a formula is specifically authorized by state law, would constitute the imposition of a prepayment penalty and hence be usurious. Our recitation of the mathematical ramifications of the refinancing effected here, at pages 925–27 *supra,* indicates that we also understand that the likely conduct of the Lender here in inducing two re-writes of the original loan shortly after it was made was at best opportunistic and at worst unfairly deceptive. However, the Debtor has not invoked the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–1, et seq. (which we prefer to refer to by its generic designation as a law punishing un-

fair or deceptive acts or practices and hence as "UDAP"), as did the respective Debtors in *Jungkurth, supra,* and *In re Russell, Russell v. Fidelity Consumer Discount Co,* 72 B.R. 855 (Bankr. E.D.Pa. 1987).

However, in contrast to *Jungkurth,* we have here not a transaction unregulated by state law as to how rebates are to be calculated and hence subject to the residual application of 41 P.S. § 405, but rather a transaction in which the method for calculating rebates is directly addressed by the CDCA. We recognize persuasive authority in this and other jurisdictions for the principle that an additional charge such as the "service charge" in issue here *should* be considered as part of the finance charge which must be rebated to the borrower upon payment. *See Union Trust Co. v. Tyndall,* 290 Md. 102, 428, 432–33, 428 A.2d 428 (1981) (all finance charges must be rebated to avoid imposition of usury law); *Jackson Investment Co. v. Bates,* 366 So.2d 225, 231 (Miss.1978) (broker's "service charge" must be rebated as part of finance charges); and *Olwine v. Torrens,* 236 Pa.Super. 51, 344 A.2d 665 (1975) (any extra charges not authorized by law for use of money, are usurious). Unfortunately for the Debtor, the pertinent provisions and interpretative Regulations of the CDCA, while they appear to us to reflect a possibly unwise public policy, are quite clear in supporting the position of the Lender that no rebates of the "service charge" are required upon prepayment.

The CDCA, at 7 P.S. § 6214 D, provides, in pertinent part, as follows: "On any contract which is wholly prepaid by ... renewal, ... the licensee shall refund to the consumer a portion of the *interest or discount* (emphasis added)." Elsewhere, the CDCA, at 7 P.S. § 6213 E, specifically defines the terms "interest or discount" as *only* the finance charges allowable *exclusive* of the "service charge." Authority to charge the "service charge" is set forth in an entirely separate section of the Act, 7 P.S. § 6213 F.

The Debtor accurately points out that the "service charge" is, certainly by the TILA

definition, 15 U.S.C. § 1605(a)(2), as well as by logical reasoning, a "finance charge." Unfortunately, the legislature clinches its meaning by stating, in the definition of "Charges," 7 P.S. § 6202, that this term "includes all interest or discount *and* the service charge which a licensee is authorized to collect (emphasis added)." If the Act, 7 P.S. § 6214 D, required a rebate of "charges," we would be inclined to agree with the Debtor that the rebate must also be computed on the "service charge." However, it does not. Instead, the rebate is confined to only those charges set forth in 7 P.S. § 6213 E, i.e., "interest or discount."

We must, therefore, reject the Debtor's usury claim. This ruling, of course, does not foreclose a UDAP claim challenging this practice on these or similar facts where it could be proven that unfair advantage was taken of unsophisticated borrowers. However, no UDAP claim or facts supporting same are presented to us on the record before us here.

### D. THE DEBTOR SUCCEEDS IN HER TILA RESCISSION CLAIM, AND HENCE IS ENTITLED TO WIPE OUT THE LENDER'S SECURITY INTEREST AND OBTAIN SUBSTANTIAL MONETARY DAMAGES, BECAUSE THE TILA CLEARLY PROVIDES FOR SAME

#### 1. THE APPLICABLE LAW

The Debtors fare far better when we consider their other Claim, asserting that they are entitled to rescind at least the December 3, 1985, transaction and, as a result, are entitled to significant damages. Like our analysis of the usury Claim, we must rely on the strict language of the pertinent law and Regulations, not on notions of "fair play." The pertinent law in this case is the federal TILA, particularly 15 U.S.C. §§ 1635(a), (b) thereof, which provide as follows:

SECTION 125—Right of Rescission as to Certain Transactions

(a) Except as otherwise provided in this section, in the case of any consumer credit transaction (including opening or

increasing the credit limit for an open end credit plan) in which a security interest, including any such interest arising by operation of law, is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom the credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this title, whichever is later, by notifying the creditor, in accordance with regulations of the Board, of his intention to do so. The creditor shall clearly and conspicuously disclose, in accordance with regulations of the Board, to any obligor in a transaction subject to this section the rights of the obligor under this section. The creditor shall also provide, in accordance with regulations of the Board, appropriate forms for the obligor to exercise his right to rescind any transaction subject to this section.

(b) When an obligor exercises his right to rescind under subsection (a), he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such a rescission. Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction. If the creditor has delivered any property to the obligor, the obligor may retain possession of it. Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value. Tender shall be made at the location of the property or at the residence of the obligor, at the option of the obligor. If the creditor does not take possession of the property within 20 days after tender by the obligor, ownership of the property vests in the obligor without obligation on his part to pay for it. The procedures prescribed by this subsection shall apply except when otherwise ordered by a court....

Also relevant to our consideration are the following provisions of the pertinent Regulations, found at 12 C.F.R. §§ 226.-23(a)(3) and (b):

SECTION 226.23—Right of Rescission

(a) Consumer's right to rescind....

(3) The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of his section, or delivery of all material disclosures, whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire three years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f) of the act....

(b) Notice of right to rescind. In a transaction subject to rescission, a creditor shall deliver two copies of the notice of the right to rescind to each consumer entitled to rescind. The notice shall be on separate document that identifies the transaction and shall clearly and conspicuously disclose the following:

(1) The retention or acquisition of a security interest in the consumer's principal dwelling.

(2) The consumer's right to rescind the transaction.

(3) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.

(4) The effects of rescission, as described in paragraph (d) of this section.

(5) The date the rescission period expires....

Taking these provisions together, it is clear that the Debtor was entitled to rescind any of her three loan transactions with the Lender at any time through 1988, 15 U.S.C. § 1635(f), provided that she is able to establish that the Lender failed to provide her with any of the disclosures required in the notice of the right to rescind, per 12 C.F.R. § 226.23(b), or any of the "material disclosures," as defined by 15 U.S.C. § 1602(u), required to be accurately provided in her TILA disclosure statement.

## 2. THE INSTANT VIOLATIONS

██ We find that the notice of the right to rescind provided to the Borrowers here in the December 3, 1985, transaction, failed to "clearly and conspicuously" disclose the elements required by 12 C.F.R. §§ 226.-23(b)(1) and (b)(4). First, with respect to § 226.23(b)(1), the notice states only that the Lender "acquired a (mortgage ...) (in) ... your home under the original transaction and will retain the (mortgage ...) in the new transaction." Actually, the Lender had acquired *two* prior mortgages *plus* an additional mortgage in the new transaction of December 3, 1985, all of which it retained. The above-quoted statement, therefore, was significantly misleading in describing the security which the Lender had in fact taken.

The Lender has two weak responses to this point. The first is that the TILA disclosure statement, by stating that the Lender took a mortgage, plus the language that "COLLATERAL SECURING OTHER LOAN WITH US MAY ALSO SECURE THIS LOAN," adequately disclosed the multiple mortgages taken. There are several short answers to this. First, per the rule established in *Gennuso v. Commercial Bank & Trust Co.*, 566 F.2d 437, 441–43 (3d Cir.1977), and followed by us in *In re Martin*, 72 B.R. 126, 129 (Bankr.E.D.Pa. 1987), we must adhere to the "one document rule" and determine whether the pertinent document, in this case the notice of the right of rescission, on its own face includes the required information, as it is clearly not helpful to a consumer to receive two inconsistent disclosures and try to guess which is correct. Secondly, the language that collateral from the other loans *may* be taken is not phrased with the requisite positive statement that there *is* collateral from another loan which remains as security, or what such collateral in fact was. That certain security simply *may* be taken is not a helpful disclosure. We note that this same language also appears on the disclosure statement provided in the March 12, 1985, transaction, when there was *no* "other loan" from which collateral could have been taken in existence. This language is thus virtually meaningless boilerplate, which fails to provide the requisite "clear and conspicuous" disclosure to the consumer of the collateral from the prior loan which has been retained, even assuming *arguendo* the non-existence of the "one document rule." Thirdly, at the time of the December 3, 1985, loan, the Lender held collateral securing two previous *loans*. The use of the singular ("securing other loan") suggests that only collateral from *one* other loan has been retained.

The Lender's second weak reply is that the December 3, 1985, transaction cancelled the previous transactions and that, since the mortgage taken therein contains a "defeasance clause," the first two mortgages, despite being of record, are in fact void. We will accept the Lender's statement that the mortgages taken in the previous transaction are void, as this assertion leads to an equitable result. It is, however, disturbing that this particular Lender's practice of retaining multiple mortgages, which was a source of difficulties for it in the past, continues. *See Bookhart v. Mid-Penn Consumer Discount Co.*, 559 F.Supp. 208, 211 (E.D.Pa.1983). Clearly, the Lender can argue no equitable basis on which to support an entitlement to retain *three* mortgages, totalling $18,447.91, against the Borrowers' residential realty as of the date of the December 3, 1985, transaction, to secure a loan the gross payments on which were only $11,400.00.

The puzzlement arises from the failure of the Lender to satisfy, apparently even to this day, these mortgages which it acknowledges are void, especially in light of

*Bookhart.* Anyone searching the title of the Borrowers' property would surely find all of them. Whether admittedly void or not, they apparently exist of record, and presumably will exist until we rectify same in our Order entered hereinafter. Furthermore, the notice of rescission given to the Borrowers clearly did *not*, as does the Lender's counsel, state that the Lender has obtained a new mortgage which has rendered the previous mortgages void by reason of defeasance. Rather, it states that the mortgage taken in the *original transaction* will be retained. Clearly, there is an ambiguity of which "original transaction" is the referrant, as mortgages existed at this time from both the March 12, 1985, and September 3, 1985, transactions. In any event, in no sense does the notice even suggest that the Lender will retain *two* mortgages from *two* previous transactions in the December 3, 1985, transaction, which was, of course, the case.

The Lender's violation of 12 C.F.R. § 226.23(b)(1) is, in itself, a "material violation" sufficient to trigger the rescission right. However, we also believe that, especially when we compare the facts and reasoning of the Lender here to those in an earlier case in which we rendered summary judgment in favor of this same Lender without opinion, *In re Matzulis, Matzulis v. Mid-Penn Consumer Discount Co.*, 74 B.R. 552 (Bankr.E.D.Pa.1987), the Lender has violated 12 C.F.R. § 226.23(b)(4) as well.

In *Matzulis*, the Lender, in rewriting a loan transaction, satisfied a mortgage previously taken against the borrower, and provided the borrower with a form consonant with the Rescission Model Form (General), 12 C.F.R., Appendix H–8. The borrower in *Matzulis* argued that, since the transaction was a refinancing of a previous loan, the Lender was obliged to provide him with the Rescission Model Form (Refinancing), 12 C.F.R., Appendix H–9. There, the Lender argued that, having satisfied the mortgage taken in the previous loan and having cast the new transaction in the form of an entirely new loan, as opposed to a refinancing or consolidation within the

scope of 12 C.F.R. § 226.23(f)(2), it had accorded the borrower a revived right to rescind the entire transaction and thus properly presented the borrower with the H–8 Form rather than the H–9 Form.

We agreed with the Lender's position in *Matzulis*. We noted at that time that the Lender's concession that its casting the new transaction as an entirely new loan gave the Borrower a right to rescind the entire transaction was consistent with the well-reasoned result of the only reported case known to us on point, *Mutual Life Insurance Co. v. Bernasek*, 235 Kan. 726, 682 P.2d 667, 671 (1984).

However, here, the Lender inexplicably failed to proceed in the fashion that this Court held was proper in *Matzulis*. The notice of rescission given here is accurately characterized by the Debtor as a "hybrid" of Model Forms H–8 and H–9. While it provides the right to the consumer to rescind the entire transaction, as opposed to just the new advance, as did the H–8 Form presented in *Matzulis*, it also states that the transaction contemplates merely an "increase" in credit, secured by a mortgage obtained in the "original transaction," like the H–9 Form.

The significant distinction between the form used here and that in *Matzulis* is that, there, the form used was in all respects an accurate portrayal of the borrower's undertaking and consequent rights, and, here, the form provided was not. If the prior mortgages are void, as was the prior mortgage in *Matzulis*, then they should have been, like the prior mortgage in *Matzulis*, satisfied. Moreover, if the new mortgage taken by the Lender on December 3, 1985, is the only valid mortgage, then it is erroneous to state that the Lender is retaining the mortgage taken in the original transaction as security.

Therefore, we hold that the Lender has violated the requirements of both 12 C.F.R. §§ 226.23(b)(1) and (b)(4) in the December 3, 1985, transaction here. These are violations which justify the Debtor's rescission effected by her counsel's letter of November 13, 1986.

### 3. THE DAMAGES

We now consider the remaining problem of the consequences of the Lender's wrongful failure to acknowledge the Debtor's rights. Unfortunately for the Lender, when we turn to the clear language of the operative statute, 15 U.S.C. § 1635(b), relative to this Claim, as opposed to that in issue in the usury Claim, the consequences are not nearly so pleasant for the Lender as they were when we turned to the statute relevant to the usury Claim.

■ First, we observe that we must consider the December 3, 1985, transaction as an entirely new transaction, giving the Debtor the right to rescind it in its entirety, as opposed to rescinding it only to the extent of any new advance, per the analysis of the *Bernasek* case and the arguments of the Lender itself both here and in *Matzulis*. Secondly, we observe that the Lender has properly conceded that the mortgages which it acquired in the March 12, 1985, and September 3, 1985, transactions are void, which becomes significant when we observe that, although she may have had a right to do so, the Debtor did not rescind these transactions, but only rescinded the December 3, 1985, transaction.

■ The first sentence of 15 U.S.C. § 1635(b) provides that, by operation of law and irrespective of any response to the Debtor's valid rescission by the Lender, two consequences ensue. One is the voiding of the security interest given by the obligor. The result of this is to also invalidate the third and last mortgage taken by the Lender, requiring that we declare all three mortgages void and that the Lender's status be reduced to that of an unsecured creditor. *See, also, e.g., In re Chancy,* 33 B.R. 355, 356–57 (Bankr.N.D.Okla.1983); *In re Piercy,* 18 B.R. 1004, 1007–08 (Bankr. W.D.Ky.1982); and *In re Wright,* 11 B.R. 590, 595 (Bankr.S.D.Miss.1981).

The second consequence is to eliminate the liability of *both* Borrowers, *see* 12 C.F.R. § 226.23(a)(4), to pay "finance or other charges" in the transaction. The parties' Stipulation includes an agreement that the Borrowers received total funds of $5,989.95 in the three transactions put together, consistent with our calculation of the sum of $3,022.07; $878.47; and $1,089.41 received, respectively, in the three transactions. We also agree that the net sum due on this balance should be the total received of $5,989.95, less the total of payments made on all three loans, which is agreed to be $2,650.00, leaving a net balance of $3,339.95.[4]

■ We do, however, disagree with the Debtor's suggestion that we should reduce the Lender's Claim by $2,000.00 as the result of recoupment penalties arising from the Lender's violations of the TILA disclosure requirements in both the September 3, 1985, transaction and the December 3, 1985, transaction. While clearly such recoupment claims are allowable, *see, e.g., Martin, supra,* 72 B.R. at 127–29; and *In re Johnson-Allen,* 67 B.R. 968, 972 (Bankr. E.D.Pa.1986), the Debtor, in her Complaint, only requests damages for violations in the December 3, 1985, transaction. Hence, we can only grant a recoupment offset of $1,000.00 to the Debtor.

■ Finally, it is well-established that the Debtor is entitled to payment of a $1,000.00 statutory penalty in light of the Lender's violation of the TILA in failing to properly respond to the rescission demand, apart from her right to recoupment of $1,000.00 for the disclosure violation for which an affirmative suit is time-barred. *See, e.g., Aquino v. Public Finance Consumer Discount Co.,* 606 F.Supp. 504, 509–11 (E.D.Pa.1985); *Bookhart, supra,* 559 F.Supp. at 212; *Reid v. Liberty Consumer Discount Co.,* 484 F.Supp. 435, 441 (E.D. Pa.1980); and *In re Wright, supra,* 11 B.R. at 595. Since there is no "secured debt" remaining in light of the invalidation of the Lender's three mortgages, we believe that it is most consistent with the policy of the TILA to direct that this sum be remitted by the Lender to the Debtor, or on her ac-

---

**4.** *Not* $3,359.95, as the Debtor's Counsel, apparently having made a slight mathematical error, suggests.

count, rather than set off against the remaining balance of the Lender's unsecured debt. *See Griggs v. Provident Consumer Discount Co.,* 680 F.2d 927, 932–33 (3d Cir.1982); and *In re Jablonski,* 70 B.R. 381, 390 (Bankr.E.D.Pa.1987). We shall therefore order that this sum be paid to the Trustee, and for the Trustee to remit this sum to the Debtor if it is clear that these funds are exempt.

■ We also must proceed to hold that the Debtor's Counsel be awarded reasonable attorney's fees, per 15 U.S.C. § 1640(a)(3), either by agreement of the parties or by Motion.

We note, however, that, while these consequences are fairly serious to the Lender, they are all that are awarded because they are all for which the Debtor has asked. The statute in issue clearly contains the potential for more. The Lender has not been asked, as the second sentence of 15 U.S.C. § 1635(b) provides, to return the $2,650.00 paid by the Borrowers to it. It is to be recalled that 15 U.S.C. § 1635(b) provides that an obligation of the Debtor to tender property received from the creditor is triggered *only* if the creditor appropriately reacts to the rescission by returning the property given and satisfying any security interest taken within twenty days. If the creditor eschews such a tender, ownership of the property given to the consumer vests in the consumer without an obligation to pay for it. This language clearly supports a contention, although not one made by the Debtor here, that, where the recalcitrance of the creditor to accept a valid rescission obviates the consumer's requirement to tender, the consumer is left with both a right to recover any payments made *and* a vesting of the proceeds of the transaction in him(her)self without an obligation to repay it. While the last sentence of § 1635(b), as amplified by 12 C.F.R. § 226.23(d)(4), allows a court to ease the impact of this section on the creditor when it would be unequitable to visit its full force upon it, we believe that an overprotective attitude towards creditors would fly in the face of the clear statutory language of § 1635(b) and eliminate any incentive to

creditors to utilize the self-enforcing aspects of § 1635(b) by voluntarily agreeing to tender the performance contemplated by the first sentence of § 1635(b).

We also note that the Debtor, to the Lender's advantage, not only failed to assert any claims for recoupment under the prior loans, but also refrained from rescinding the earlier loans, although they were made at a time which would have still permitted a rescission could have been effected through 1988. *See* 15 U.S.C. § 1635(f). Such actions could have multiplied the Debtor's statutory damages for failure to properly respond to each rescission.

The Lender is, thus, fortunate to emerge from this transaction as it does per the enclosed Order: with an unsecured claim of $2,339.95 and an obligation to pay $1,000.00 statutory damages to the Trustee on the Debtor's account, and a reasonable attorney's fee to her counsel.

### ORDER

AND NOW, this 18th day of June, 1987, upon consideration of the Stipulation of Facts making up the record of this case and the respective Briefs of the parties, consistent with the foregoing Opinion, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in favor of the Plaintiff, JOHNETTE TUCKER, and against the Defendant, MID–PENN CONSUMER DISCOUNT COMPANY, on "Claim One" of the Adversary Complaint in issue, alleging violations of the federal Truth-in-Lending Act and Regulations, and in favor of the Defendant and against the Plaintiff on "Claim Two" of the Complaint, alleging violations of 41 P.S. § 502 and 7 P.S. § 6214 D.

2. The Claim of the Defendant is reduced to an Unsecured Claim in the amount of $2,339.95 against the Plaintiff.

3. The Defendant shall satisfy any and all mortgages which it has taken against the Plaintiff's residential real estate at 712 South 58th Street, Philadelphia, Pennsylva-

nia 19143, within ten (10) days from the date of this Order.

4. The Defendant shall pay the sum of $1,000.00 to the Standing Chapter 13 Trustee, Edward Sparkman, Esquire. The said Trustee shall determine whether this sum is claimable as part of the Debtor's exemptions, and, if it is, then he shall forward this sum to the Debtor forthwith.

5. The parties are urged to attempt to agree upon reasonable attorney's fees and costs which are due to the Plaintiff's Counsel, per 15 U.S.C. § 1640(a)(3). If this matter is not resolved within ten (10) days, the Plaintiff's Counsel shall, within thirty (30) days of this Order, file a Motion requesting such fees, said Motion to be procedurally in conformity with *In re Meade Land and Development Co., Inc.*, 527 F.2d 280 (3d Cir.1975). However, if the Plaintiff's Counsel remits a reasonable request for such fees, which is refused, the said Counsel may recover compensation for time spent on the fee application as well.