In re Gloria JONES, Debtor.

Gloria JONES, Plaintiff,

v.

MID–PENN CONSUMER DISCOUNT COMPANY, Defendant.

Bankruptcy No. 86–05212S.
Adv. No. 87–0062S.

United States Bankruptcy Court,
E.D. Pennsylvania.

Oct. 23, 1987.

Susan DeJarnatt, Philadelphia, Pa., for plaintiff/debtor.

Arthur Matusow, Philadelphia, Pa., for defendant.

Edward Sparkman, Philadelphia, Pa., Standing Chapter 13 trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION AND PROCEDURAL HISTORY

In several respects, the instant case parallels another case before us involving the same lender, *In re Tucker*, 74 B.R. 923 (Bankr.E.D.Pa.1987). As in *Tucker*, we rule against the Debtor on an issue of interpretation of state law regarding computation of rebates of unearned finance charges. However, based in large part on our reasoning in *Tucker*, and a subsequent decision of Chief Judge Emeritus Joseph A. Lord of the District Court in *In re Abele*, 77 B.R. 460 (E.D.Pa.1987), we find that the Lender, as in that case, has failed to properly respond to a meritorious exercise of a right to rescind the transaction under the federal Truth-in-Lending Act, 15 U.S.C. § 1601, et seq. (hereinafter referred to as "TILA"), by the Debtor. As a result, the Debtor is able to melt the Lender's secured Proof of Claim in the total amount of $7,862.70 down to an unsecured Proof of Claim in the amount of $1,958.60 and recover $1,000.00 in statutory damages from the Lender in addition.

The Debtor, GLORIA JONES, filed the instant Chapter 13 bankruptcy case on November 10, 1986. On February 6, 1987, she initiated the instant Adversary proceeding against the Defendant herein, MID–PENN CONSUMER DISCOUNT COMPANY (herein referred to as "the Lender"). After the Complaint was amended and thereafter answered, the matter came before us for a hearing on July 29, 1987. By an Order dated August 4, 1987, we memorialized the parties' agreement to submit the case on a Stipulation of Facts and Briefs to be completed on October 9, 1987. By agreement of the Lender, the Debtor was permitted to submit a Reply Brief on October 21, 1987.

### B. RELEVANT FACTS

Like the *Tucker* and *Abele* Debtors, the Debtor here, with a co-borrower named Pauline Stokes (collectively the Debtor and Ms. Stokes shall be referred to as "the Borrowers"), entered into several transactions with the Lender, although here the number of transactions was a modest two, rather than three as in *Tucker* and eight as in *Abele*.

The first transaction occurred on September 20, 1984, at which time the Borrowers made a loan written pursuant to the Pennsylvania Consumer Discount Company Act, 7 P.S. § 6201, et seq. (hereinafter referred to as "CDCA"), from the Lender in which they received in the net sum of $4,105.00. Addition of credit insurance totalling $248.00, a mortgage recording fee of $11.00, and finance charges of $2,836.00 at an Annual Percentage Rate (hereinafter referred to as "APR") of 27.16 percent brought the sum of the gross payments

due under the Contract to $7,200.00. Repayment of the loan was to be made in the forty-eight monthly payments of $150.00, the first payment being due on November 5, 1984.

The Lender took a mortgage in the amount of $7,200.00 against the Borrowers' residential realty located at 5524 Ridgewood Street, Philadelphia, Pennsylvania 19143, as security in the transaction. Accordingly, the Lender was obliged to provide the Borrowers with a notice of their right to rescind the transaction at any time "until midnight of the third business day following consummation of the transaction or the delivery of the information and rescission forms required under this section togehter with a statement containing all material disclosures required under this title, whichever is later, ..." 15 U.S.C. § 1635(a). *See also* 12 C.F.R. § 226.15(a). The Lender supplied a notice of rescission to the Borrowers which appears to us to track Appendix H–8—Rescission Model Form (General) of Regulation Z.

The second transaction between the Borrowers and the Lender, also written pursuant to the CDCA, occurred on July 16, 1985. It appears to have been motivated by the Borrowers' desire to obtain the $553.60 additional funds which they received in this transaction. Although we are bound by the parties' Stipulation that the Borrowers made six payments on the first transaction loan, the second transaction papers indicate that the "gross balance" of the account as of the date of this transaction was $5,850.00, which suggests that the full nine payments due over this period were paid.

The Lender computed the rebate deductible from the credit insurance charges and discount or interest of $2,736.00 [1] by utilizing a Rule of 78's refund charge [2] and determining that the loan had run ten months, although it had been only nine

months and eleven days from the date that the first payment was due in the first transaction (November 5, 1984) through the date of the second transaction (July 16, 1985). The figures ascertained by this formula were $1,723.96 for the finance charge rebate and $175.31 for the credit insurance rebate.

The total amount financed in the transaction, including additional credit insurance and official fees, was $4,661.00. Finance Charges totalling $3,018.40, at an APR of 27.07 percent were imposed, and the total sum of payments was $7,680.00. Payments of $160.00 monthly were to be made for forty-eight months, beginning August 10, 1985.

A new mortgage against the Borrowers' home was taken as security in the transaction, in the amount of $7,680.00. However, the old mortgage remained of record. The new notice of the Borrowers' rescission right states, in its crucial first paragraph, as follows:

Your Right to Cancel:

You are entering into a new transaction to increase the amount of credit provided to you. We acquired a (mortgage/lien/security interest) (on/in) your home under the original transaction and will retain that (mortgage/lien/security interest) in the new transaction. You have a legal right under federal law to cancel the new transaction without cost, within three business days from whichever of the following events occurs last:
...

As we observed in *Tucker*, this phraseology constitutes a "hybrid" of Rescission Model Form H–8 and Model Form H–9, Rescission Model Form (Refinancing).

The parties stipulated that the Borrowers made five payments of $160.00 on the second transaction loan, making the total of payments on both loans $1,700.00. On January 2, 1987, the Debtor's Counsel ad-

---

**1.** Part of the finance charge of $2,836.00 was a $100.00 service charge which we held, in *Tucker*, the CDCA does not require the Lender to rebate. 74 B.R. at 927–28.

**2.** The meaning and significance of the Rule of 78's is described very well in J. Hunt, *The Rule*

of 78: *Hidden Penalty for Prepayment in Consumer Credit Transactions*, 55 BOSTON U.L. REV. ₃31 (1975). Our critique of the use of this method of calculating refunds is contained in *In re Jungkurth*, 74 B.R. 323, 332–34 (Bankr.E.D. Pa.1987).

vised the Lender that she was exercising her right to rescind the second transaction loan. On January 21, 1987, the Lender responded that it believed that the Debtor had no right to rescind this transaction. On May 7, 1987, the Debtor's Counsel advised that the Debtor was exercising her right to rescind the first transaction loan also. On May 19, 1987, the Lender replied that, while it did not believe that a right to rescind existed, it was at that time taking steps to satisfy the mortgage taken as security in the first transaction. By that time, of course, the instant proceeding was well under way. The Debtor amended her Complaint to include allegations of violations arising in the first transaction also.

## C. THE ONLY POTENTIALLY VIABLE CLAIMS RELATE TO THE REBATE FORMULA AND NOTICE OF RESCISSION RIGHT FORM UTILIZED IN THE SECOND TRANSACTION BETWEEN THE PARTIES

The Debtor asserts four violations of the TILA which she contends justify her purported rescission of both of these loan transactions and gave rise to recoupment damages for TILA violations in the disclosure statements. Unfortunately, at several pertinent points in her Brief, the Debtor fails to differentiate between the violations that apply to only the first transaction, or those applicable only to the second transaction, or those applicable to both. In discussing the alleged violations below, we are therefore initially faced with analyzing to what transaction the Debtor's allegations pertain.

The four alleged violations are as follows:

1. A failure to disclose "hidden finance charges" due to an allegedly improper application of the rebate formula in computing the payoff in the first transaction, rendering the disclosure of finance charges imposed in the second transaction inaccurate.

2. A failure to provide an accurate notice to the Debtor of her right to rescind.

3. Inclusion of an extraneous figure in the "federal box" in the second transaction.

4. The appearance of a tiny letter "E.," which the form indicates "means an estimate," in the boxes in which the "Finance Charge" and the "Total of Payments" are included in both transactions.

■ The third and fourth alleged violations can be disposed of at the outset. In order to successfully assert a TILA claim for damages, whether in the nature of recoupment or otherwise, TILA violations in the disclosure statement must be among those enumerated in 15 U.S.C. § 1640(a)(3). In order to give rise to a right to rescind, violations of the TILA must appear in the notice of the rescission right itself or must constitute a "material violation" of the TILA, as defined in 15 U.S.C. § 1602(u). *See* 15 U.S.C. § 1635(a); 12 C.F.R. § 226.-23(a)(3); and *In re Melvin*, 75 B.R. 952, 956 (Bankr.E.D.Pa.1987).

The third asserted violation, the inclusion of an extraneous figure in the "federal box," in purported violation of 12 C.F.R. § 226.17(a), was factually disputed by the Lender, who claims that the extraneous figure, the recitation of the $4,105.00 net figure which the Debtor received, appeared only in an internal copy of the disclosure statement retained by the Lender and not on the significant copy, i.e., the one delivered to the Debtor. Putting aside the factual issue of whether the $4,105.00 figure appeared on the Debtor's copy or not, an issue which we cannot resolve on this record, it is apparent that the appearance of this figure, at most a technical violation of 12 C.F.R. § 226.23(a), would not be within the scope of 15 U.S.C. § 1640(a)(3) or 12 C.F.R. § 226.23(a)(3). Wisely, the Debtor withdrew her claim that this was an actionable violation in her Reply Brief.

■ The fourth asserted violation, that the Lender improperly disclosed figures designated as "estimates," in purported violation of 12 C.F.R. § 226.17(c)(2) and Federal Reserve Board Offical Staff Commentary § 226.17, ¶ 17(c)(2), is also not well-taken. This is not a situation comparable to that in which we found an actionable TILA violation in a lender's use of estimated disclosures because the estimates were at var-

iance from the actual figures representing the Finance Charge, the APR, and the amounts of payments, as in *In re Mitchell*, 75 B.R. 593, 596 (Bankr.E.D.Pa.1987). Rather, the sole violation alleged here is the mere presence of a tiny letter "E." in the disclosure boxes on the statement which in fact contain the *actual* Finance Charge and Total of Payments in the respective transactions. If this constitutes a violation of the TILA and its Regulations at all, it is hardly a violation within the scope of either 15 U.S.C. § 1640(a)(3) or of 12 C.F.R. § 226.23(a)(3).

We are thus left with only the first and second alleged violations. We would note at the outset that these violations could conceivably only be raised in reference to the second transaction. The "hidden finance charges" imposed by allegedly improper calculations of rebates could apply only to a re-financing transaction, and only the second transaction *was* a refinancing transaction. The notice of the rescission right provided in the first transaction was a flawless reproduction of the clearly-applicable H–8 Model Form. Potential problems arose only when the original $7,200.00 mortgage remained in tandem with the $7,680.00 mortgage in the making of the second transaction. Therefore, we fail to find any actionable TILA claim, justifying either recoupment or rescission, which arose out of the first transaction. We are thus left with considering whether either of the first two violations alleged by the Debtor occurred in the second transaction have merit.

## D. APPLICABLE STATE LAW AUTHORIZES THE REBATE FORMULA UTILIZED BY THE LENDER

█ The claim that the Lender improperly included "any unearned portion of the old finance charge that is not credited to the existing obligation," in violation of 12 C.F.R. § 226.20(a), touches our equitable sensibilities, as did the argument of the Debtor in *Tucker* that the Lender should rebate the unearned "service charge." We reiterate, as we did there, 74 B.R. at 927–28, that we perceive that the Rule of 78's, applied in any context, provides an unfair

advantage to a lender, in comparison with the "true" actuarial method, as we did earlier in *Jungkurth*, 74 B.R. at 332–34. This advantage is rendered even more unfair by the spectacle of "flipping," which we noted was graphically portrayed by the facts in *Tucker*. 74 B.R. at 926–27.

However, as was the case in *Tucker*, we must observe, as the Lender here argues, that whether the interest retained from the old finance charge is "unearned" is a function of whether applicable state law allows it. Otherwise, we would be compelled to hold that 12 C.F.R. § 226.20(a) provides a cause of action to every debtor who is not provided a rebate computed pursuant to the actuarial method. We do not believe that establishing such a state of affairs, even if a desideratum, was the intent of this Regulation. We also note that the Debtor does not argue this point, but merely contends that, if the Rule of 78's were properly applied as she argues, no violation of 12 C.F.R. § 226.20(a) would arise.

As in *Tucker*, we are required to turn to the CDCA, pursuant to which this transaction was written, to determine whether the methodology for computing rebates utilized by the Lender here passes muster. The pertinent statute, again, is 7 P.S. § 6214D, which provides as follows:

D. A licensee shall permit a consumer to pay partially or wholly any contract or any installment on a contract, prior to the due date. On any contract which is wholly prepaid by cash, renewal or otherwise, at any time prior to maturity, the licensee shall refund to the consumer a portion of the interest or discount. *The portion to be refunded shall be that portion of the interest or discount which the sum of the monthly balances originally scheduled to be outstanding during the full months following such prepayment in full bears to the sum of all monthly balances originally scheduled to be outstanding, both sums to be determined to by the schedule of payments in the original contract,* provided a licensee shall not be required to refund any portion of such interest or discount when the total amount of the refund

computed as herein provided is less than one dollar ($1). Such refund shall be computed and paid or credited at the time of prepayment on the contract (emphasis added).

The grammar of this statutory provision, particularly that of the emphasized third sentence, which is crucial to our inquiry, almost defies interpretation. However, if a "repayment in full" on July 16, 1985, is hypothecized in a contract running from November 5, 1984, to October 5, 1988, the "full months following such repayment" would be thirty-eight, i.e., August 5, 1985, through October 5, 1988. The "proportion of the interest or discount" which the original sum of forty-eight monthly balances would appear to suggest the use of the figure of thirty-eight for "Months to Rebate" on the Rule of 78 Monthly Rebate Table reproduced from D. Thorndike, *Thorndike Enclopedia of Banking & Finance* (1980), as an Appendix to the Debtor's Brief. Use of the multiplier appearing in that column, 63.0102, yields the rebate figures accurately ascertained by the Lender.

The Lender attaches to its Brief a letter dated June 3, 1987, to its principal, Edwin Seave, Esquire, from Hugh A. Benson, Esquire, Chief Counsel of the Pennsylvania Department of Banking, in which Mr. Benson answers the question as to whether a fraction of a month can be considered as a full month in calculating rebates under the CDCA in the affirmative. In her Reply Brief, the Debtor raises what we believe is a legitimate question as to the propriety of the use of such an unofficial letter, the letter to which it is responding not having been produced, for any purpose at all. However, in so doing, she also states "that the letters simply state that which is not in dispute—that state law allows a creditor to consider a fraction of a month to be a full month for refunding purposes." Reply Brief in Support of Plaintiff's Motion for Summary Judgment, at 3. The Debtor hence agrees that the Lender has properly applied state law, presumably § 6214D, in computing the rebate. This, we believe, is a concession of the only doubtful issue.

We therefore conclude, though with we believe it to be a closer question than apparently does the Debtor, that the method of calculation of the rebates utilized by the Lender here is correct under state law. If it is correct under state law, this factor, we believe, requires a disposition in favor of the Lender. We further note one equity in favor of the Lender on this point. Section 6214D requires reference to the "schedule of payments," not the date of the loan, as the referrant for determination of the rebate. In the first transaction, although the Borrowers presumably received the funds in issue shortly after the September 20, 1984, contract date, they were not obliged to begin payments until November 5, 1984. If the rebate were measured from when the Borrowers received the funds in September, 1984, through July 16, 1985, obviously the rebate would be greater. This factor blunts the Debtor's argument that she paid "double interest" between July 16, 1985, and August 10, 1985, the due date of the first payment in the second transaction. In fact, if the July 16, 1985, loan had been refinanced, the rebate would have been referenced from August 10, 1985.

The decision in *Steele v. Ford Motor Credit Co.*, 783 F.2d 1016 (11th Cir.1986), the sole authority relied upon by her, is therefore of little help to the Debtor. The court there states that "[n]either the [TILA] nor Regulation Z says anything about when interest is earned and when it is unearned. Thus, courts confronted with that question turn to state law." *Id.* at 1018. We believe that this statement means that interest charges allowable under state law must be deemed "earned." This is another way of stating our initial observation, at page 237 *supra*, that 12 C.F.R. § 226.20(a) does not require a lender to utilize a "fair" method of calculating rebates in financing transactions, like the actuarial method, but only the method required by state law. In *Steele*, the applicable state law obviously did not, as we hold the CDCA does, permit the lender to calculate rebates by considering a partial month as a full month. Thus, we are constrained to reject the first of the alleged violations of the TILA in issue as to the second

transaction, as we did the third and the fourth.

## E. THE LENDER HAS VIOLATED THE APPLICABLE REGULATIONS IN DISPATCHING ITS NOTICE OF RESCISSION RIGHT, JUSTIFYING RESCISSION OF THE SECOND TRANSACTION

█ However, on the second alleged violation, supported strongly by not only our decisions in both *Tucker* and *Melvin, supra,* but also by Judge Lord's decision in *Abele,* the Debtor hits home. In light of these decisions, we must agree with the Debtor's assertion that the notice of rescission right provided to the Debtor in the second transaction fails to properly disclose the "retention or acquisition of a security interest in the consumer's principal dwelling," as required by 12 C.F.F. § 226.-23(b)(1), and the "effects of rescission," as required by 12 C.F.R. § 226.23(b)(4).

The Lender retained two separate mortgages as security from July 16, 1985, through the date that it satisfied the mortgage taken on September 20, 1984, in response to the Lender's letter of May 7, 1987. Far from "clearly and conspicuously" disclosing the presence of a new, larger mortgage in addition to the previous mortgage, the notice of rescission right recites only that the Lender "acquired a (mortgage ...) (in/on) your home under the original transaction and will retain that (mortgage ...) in the new transaction."

Concededly, this notice is an improvement over that considered by us to be inadequate in *Melvin* in one respect. The notice accurately states the Borrowers can rescind the entire new transaction, not just the increase in the amount of credit. *Compare Melvin,* 75 B.R. at 956. However, like the notice in *Tucker,* the notice here is misleading in that it states that it contemplates an "increase" in credit secured only by the mortgage obtained in the "original transaction." 74 B.R. at 931. It fails to warn the Borrowers of the fact that they may have to effect two rescissions, as did the Debtor here, to eliminate all mortgages remaining in existence at the time of the July 16, 1985, transaction. Hence, the notice fails to comply with 12 C.F.R. § 226.-23(b)(4), as well as clearly violating § 226.-23(b)(1).

The Lender presents essentially two arguments in response to the Debtor's assertions on this alleged violation: (1) It is placed in a difficult dilemma of choosing the proper rescission notice Model Form to describe the Borrowers' rights in this transaction, and should not be penalized for utilizing a form which is more accurate than either Model Form; and (2) The defeasance clause in the mortgage taken in the first transaction renders it void and hence of no consequence.

We shall consider this second argument first. In making this argument, the Lender is immediately confronted with not only our own rejection of this argument in *Tucker,* 74 B.R. at 930–31, but the Opinion of Judge Lord in *Abele,* where he characterizes this argument as "specious." At 464. The Lender proceeds to offer a sur-rebuttal to the reasoning of Judge Lord, contending that his reliance on that portion of the defeasance clause which extends its scope to future advances is misplaced. The principal argument is that the Lender "waived" the future advances clause by taking a second mortgage and that the Pennsylvania Supreme Court, in *Western Pennsylvania Nat'l Bank v. Peoples Union Bank & Trust Co.,* 439 Pa. 304, 308, 266 A.2d 773, 776 (1970), indicated that the validity of such a clause is waived if the Lender was not obligated to make future advances.

The Lender's reasoning, in addition to being convoluted, misconstrues the impact of *Western Pennsylvania,* a case which we analyzed at some length in *In re Morrison,* 69 B.R. 586, 591 (Bankr.E.D.Pa.1987). We explained that, in *Western Pennsylvania,* "the issue was whether a mortgagee with an undisclosed mortgage as to future advances 'has a prior lien on the mortgaged property with respect to future advances against a *bona fide holder whose lien attaches after the future advances were made.*' (emphasis added)." *Id.,* quoting *Western Pennsylvania,* 439 Pa. at 306–07,

266 A.2d at 775. Here, the future advances clause is not undisclosed, but is prominently disclosed in paragraph one of the Mortgage, and thus presents a far different issue than that of a "hidden" future advances claim considered in *Western Pennsylvania*. More importantly, however, the validity of the future advances clause is not being attacked by a bona fide subsequent lienholder here. The only issue in *Western Pennsylvania* was the priority of the lien of a subsequent lienholder vis-a-vis that of a prior mortgagee with a "hidden" future advances claim. Here, there is no issue of priority at all. Clearly, as between the parties to the transaction, the future advances clause, no matter what its form, is valid. *See Morrison, supra,* 69 B.R. at 590. *See also In re Chandler,* 76 B.R. 460, 463, 464 (Bankr.E.D.Pa.1987). Therefore, there is no basis on which to conclude that the Lender here "waived" the future advances clause or that it is invalid, and the reasoning of Judge Lord in *Abele* is thus unshaken by the Lender's arguments.

Furthermore, as we pointed out in *Tucker,* 74 B.R. at 930–31, accepting the Lender's argument that the earlier mortgage is void, a conclusion which we would have to alter to a determination that it is merely *voidable* in light of *Abele,* does not eradicate the existence of two mortgages of record. The mere fact that two mortgages existed of record against her residence prior to May, 1987, had at least some detrimental impact on the Debtor's property rights in her residence. Thus, the Lender's failure to satisfy the original mortgage at the time of the second transaction and the recordation of the second mortgage, thus creating two contemporaneous mortgages, raises serious problems for it in any event. Moreover, this particular Lender has persisted in this practice despite the warning arising from its condemnation well before either of the transactions in issue in *Bookhart v. Mid-Penn Consumer Discount Co.,* 559 F.Supp. 208, 211 (E.D.Pa.1983).

We totally reject the Lender's plea that the rulings in *Tucker, Melvin,* and *Abele* place the Lender in a dilemma, wherein no matter what measures it takes to provide accurate notices of rescission rights, it will be found to have, in one sense, violated the applicable statute and/or Regulations. As we indicated in both *Tucker,* 74 B.R. at 931, and *Melvin,* 75 B.R. at 956–57, we believe that this same Lender correctly provided a notice of the rescission right in the factual setting of *In re Matzulis, Matzulis v. Mid–Penn Consumer Discount Co.,* Bankr. No. 86–01964G, Adv. No. 86–0691S (Bankr.E.D.Pa. Jan. 22, 1987).[3] In that case, the Lender utilized the Model Form H–8 in a refinancing transaction in which a new mortgage was taken as security and the mortgage taken as security in the previous loan transaction was immediately satisfied. We are puzzled as to why the same lender would utilize one procedure, which it argued and we agreed was correct in one instance, and then proceed to utilize a different procedure in other transactions.

In addition to utilizing the Model Form H–8 in a refinancing transaction where a new mortgage is taken, the Lender could have proceeded in another fashion, as described in 12 C.F.R. § 226.23(f)(2) and exemplified by the February 9, 1978, transaction mentioned in the *Melvin* case. *See* 75 B.R. at 953, 957. In that transaction, the lender rewrote an earlier transaction of August 2, 1976, and retained, as security, only the mortgage taken in the original August 2, 1976, transaction. However, for reasons we found inexplicable, the Lender there refused to follow this proper procedure in its later transactions with the same debtors. Hence, the rulings in *Tucker, Melvin,* and *Abele* expressly resolved any dilemma of the Lender regarding how it could have proceeded in a manner consistent with the applicable TILA statutory provisions and Regulations by providing two separate examples to it.

Hence, the Lender presents no new or convincing arguments as to why we should

---

**3.** We note that this is *not* the same Adversary proceeding involving the same Debtor and a different creditor which is reported at 74 B.R.

552, as is indicated in the reported version of the *Melvin* case, 75 B.R. at 956.

not follow the decision in *Abele,* supporting our own previous results in *Tucker* and *Melvin.* The Lender must therefore again be subjected to the rather harsh consequences for disregarding the Debtor's valid recission of the second transaction loan.

### F. THE DEBTOR'S VALID RESCISSION REDUCES THE LENDER'S CLAIM TO AN UNSECURED CLAIM OF $1,958.60 AND ENTITLES HER TO $1,000.00 STATUTORY DAMAGES AS WELL

 In both *Tucker,* 74 B.R. at 932–33, and *Melvin,* 75 B.R. at 957–59, we set out the consequences of a lender's disregarding a valid rescission, as established in 15 U.S.C. § 1635(b), at length. We shall not reiterate and analyze the statutory language in detail again, but simply refer to the discussions cited there and note the following consequences as applied to the facts here:

1. The mortgage imposed in the second transaction, having been rendered void, must be satisfied by the Lender, destroying its secured status.

2. All "finance or other charges" are eliminated. The parties stipulated that the Debtor received $4,105.00 in the first transaction and $553.60 in the second transaction, or a total of $4,658.60. They further stipulated that the Debtor repaid a total of $1,700.00.[4] Therefore, a balance of $2,968.60 remained.[5]

3. The Debtor is entitled to a $1,000.00 recoupment penalty in light of the Lender's failure to comply "with the requirement of [11 U.S.C. § 1635]...." 15 U.S.C. § 1640(a)(3). Thus, the Lender's unsecured claim is further reduced to $1,968.60.

4. The Debtor is also entitled to a separate, $1,000.00 statutory penalty due to the Lender's distinct violation of the TILA in failing to properly respond to the Debtor's valid rescission, which, having occurred

subsequent to the commencement of this action, is certainly within the applicable limitations period of 15 U.S.C. § 1640(e).

5. Finally, the Debtor's counsel is entitled to a reasonable attorney's fee for thus maintaining a successful action, per 15 U.S.C. § 1640(a)(3).

### G. CONCLUSION

We shall enter an Order consistent with this result.

---

4. As we indicated at pages 235–236 *supra,* we have some doubt as to whether this figure is correct, as the documents written in connection with the second transaction suggest that she paid more. However, we consider ourselves bound by the parties' Stipulation on this point.

5. The Debtor, apparently making a mathematical miscalculation, asserts that this figure should be $2,868.60.