108 B.R. 522 (1989)
In re Glorious MILBOURNE,[1] a/k/a Glorious Dillard, Debtor.
Glorious MILBOURNE, a/k/a Glorious Dillard, Plaintiff,
v.
MID-PENN CONSUMER DISCOUNT COMPANY, Defendant.
Bankruptcy No. 88-13246S, Adv. No. 89-0199S.
United States Bankruptcy Court, E.D. Pennsylvania.
December 19, 1989.
*523 Gary Klein, Community Legal Services, Inc., Philadelphia, Pa., for plaintiff, debtor.
Edward Sparkman, Philadelphia, Pa., standing Chapter 13 Trustee.
Arthur J. Matusow, Philadelphia, Pa., for defendant.

OPINION
DAVID A. SCHOLL, Bankruptcy Judge.
A. INTRODUCTION
Before us is another proceeding involving the most prolific protagonist of contests raising thought-provoking issues of interpretation of consumer-law in this court, MID-PENN CONSUMER DISCOUNT COMPANY (hereinafter "Mid-Penn").[2] As in In re Nichols, Nos. 89-1445 and 89-1474 (3d Cir. Nov. 28, 1989) [893 F.2d 1331 (table)], aff'g, C.A. No. 88-1253, 1989 WL 46682 (E.D.Pa. April 28, 1989), aff'g, Bankr. No. 86-05809S, Adv. No. 87-0600S (Bankr.E.D.Pa. Nov. 10, 1987); In re Jones, 79 B.R. 233 (Bankr.E.D. Pa.1987); and In re Tucker, 74 B.R. 923 *524 (Bankr.E.D.Pa.1987), this proceeding raises issues under both the federal Truth-in-Lending Act, 15 U.S.C. § 1601, et seq. (hereinafter "the TILA"), and Pennsylvania state consumer protection laws.
Consistent with the results in Nichols, Jones, and Tucker, as well as our own recent Opinion in In re Perkins, Perkins v. Mid-Penn Consumer Discount Co., 106 B.R. 863 (Bankr.E.D.Pa.1989), Mid-Penn fails in its defense of its refusals to allow rescissions of loans in which it failed to disclose, in its notices of the right to rescind its loan transactions required by the TILA, that it has retained multiple mortgages against the Debtor's residence. As a result of these TILA violations, Mid-Penn suffers loss of its security interests in the Debtor's residence, its entire claim against the Debtor is eliminated, and it becomes liable to the Debtor in the total sum of $4,957.14.
However, also as in Nichols, Jones, and Tucker, Mid-Penn fares much better in the challenges of certain of its alleged practices under state law, here the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, et seq. (which, since it is generically a law regulating u nfair or d eceptive a cts or p ractices, is referred to hereinafter as "UDAP"). We refuse to find that its failure to disclose its retention of multiple mortgages renders it liable for a violation of UDAP because no actual damages flowing therefrom are proven. We also find that the instant record does not support the Debtor's contention that she was required to buy credit life and disability insurance, causing us to reject all claims made under both UDAP and the TILA involving Mid-Penn's sale of credit insurance to the Debtor. We do find violations of UDAP arising from Mid-Penn's failure to adequately disclose to the Debtor the detrimental aspects of refinancing her loans, as opposed to her making new loans for additional advances of funds. However, we decline to find, on this record, any significant actual damages to the Debtor arising therefrom, and hence we shall award the Debtor only an additional $500 in connection with these violations.
B. PROCEDURAL HISTORY
The Debtor, GLORIOUS MILBOURNE, formerly known as GLORIOUS DILLARD, filed the underlying voluntary case under Chapter 13 of the United States Bankruptcy Code on September 19, 1988. On December 8, 1988, Mid-Penn filed an amended secured Proof of Claim reciting arrearages of $1,320.52 and a sum purportably to be paid directly to Mid-Penn, apparently constituting payments due post-petition, of $3,360.00. Since the inception of this adversary proceeding on March 17, 1989, objecting to that Proof of Claim, it has been the centerpiece of this case, and the delay in its resolution has already resulted in four continuances of the Confirmation hearing since it was originally listed on May 4, 1989, the most recent continuance setting back confirmation until December 19, 1989. In our accompanying Order, we express our intention not to continue this matter again.
At an early stage in this proceeding, on April 4, 1989, Mid-Penn moved to dismiss the Debtor's UDAP claims on the ground that they were not brought within the time of the allegedly-applicable statute of limitations. Mid-Penn argued that the two-year limitation period set forth in 42 Pa.C.S. § 5524(5), relating to actions "for a civil penalty or forfeiture," was applicable to the Debtor's UDAP claims. Observing that UDAP is not a penal statute, we denied Mid-Penn's Motion to Dismiss by Order of April 5, 1989. On April 19, Mid-Penn filed a Motion for Reconsideration of this Order, which we in turn denied by Order dated April 20, 1989. We did explain, in the second Order, that our Orders denying the motion to dismiss were merely meant to defer final resolution of the limitations issue until trial. As it developed, the Debtor has uncovered a decision by the Pennsylvania Superior Court in Gabriel v. O'Hara, 368 Pa.Super. 383, 390-91, 534 A.2d 488, 494-96 (1978), holding that the six-year catch-all limitations period provided in 42 Pa.C.S.A. § 5527(6) applies to actions under UDAP. Applying the six-year limitation period clearly renders the claims raised in this proceeding timely. Mid-Penn *525 therefore does not discuss this issue in its post-trial submissions and apparently has abandoned it.
On May 24, 1989, eight (8) days before the continued trial date of this proceeding, Mid-Penn filed a Motion for Disqualification or recusal of the undersigned. The substantive basis for the motion appeared to relate to certain statements made by this court in the Opinion of June 23, 1987, in Tucker, supra.
We denied the recusal motion on two grounds. Firstly, we determined that it was untimely because Mid-Penn had invoked "participation by the court in pretrial motions and other judicial proceedings between the time [it] first learned of the asserted prejudice and the time the § 144 motion was filed." Shank v. American Motors Corp., 575 F.Supp. 125, 129 (E.D. Pa.1983). See also Smith v. Danyo, 585 F.2d 83, 86 (3d Cir.1978); and In re Gulph Woods Corp., 84 B.R. 961, 966 (Bankr.E.D. Pa.1988). Here, the "asserted prejudice" was known to Mid-Penn even before the instant proceeding was filed. However, no recusal motion had been filed until after this court had decided two pre-trial motions adversely to Mid-Penn, and no explanation was provided for the belated invocation of this issue.
Secondly, we determined that the motion lacked substance. Its substantive basis appeared to arise from Mid-Penn's belief that the language of this court was overly harsh to Mid-Penn in analyzing the impact of a series of refinancing agreements and characterizing its practices as "flipping" in Tucker, supra, 74 B.R. at 926-27. However, the bias justifying recusal under either applicable statute, i.e., 28 U.S.C. § 144 and 28 U.S.C. § 455(a), must be "personal." See, e.g., In re By-Rite Oil Co., 91 B.R. 771, 774 (Bankr.E.D.Mich.1988); and In re Johnson-Allen, 68 B.R. 812, 817 (Bankr.E. D.Pa.1987), modified, 70 B.R. 350 (E.D.Pa. 1987). The applicable standard for determining whether a judge's "impartiality might reasonably be questioned" under § 455(a) is an objective one, not determined solely by the moving party's subjective belief that a judge's impartiality might be questioned. See By-Rite, supra, 91 B.R. at 774; and Johnson-Allen, supra, 68 B.R. at 817. "In the absence of demonstrated bias, a judge's actions, stated impressions, comments, findings or rulings in judicial proceedings are not grounds for disqualification." By-Rite, supra, 91 B.R. at 774. Cf. Gulph Woods, supra, 84 B.R. at 966.
We noted that, in Tucker, our analysis of the refinancings in issue was principally undisputed mathematical calculations. 74 B.R. at 925-27. Given the facts as adduced there in light of our calculations, we rejected Mid-Penn's contention that our use of the term "flipping" was incendiary or reflective of a bias against refinancing generally, as opposed to its abuses in certain circumstances. We thus concluded that our dictum in Tucker in no sense justified recusal, as it at worst constituted merely a judge's "stated impressions" or "comments." Moreover, our statements were not uttered in the course of the same case in which recusal was sought, as in one authority cited by Mid-Penn, United States v. Grinnell Corp., 384 U.S. 563, 580-83, 86 S.Ct. 1698, 1708-10, 16 L.Ed.2d 778 (1966), nor were they as pointed and acerbic as those of the judge of whom recusal was sought in the Grinnell Corp. Nevertheless, the Court refused to require recusal in that case. No statements in Tucker were in any sense comparable to the comments reflecting the personal bias and prejudice against the Defendant because of his nationality as appeared in the statements which the Court held required recusal in another case relied upon by Mid-Penn, Berger v. United States, 255 U.S. 22, 28-30, 41 S.Ct. 230, 231-32, 65 L.Ed. 481 (1920).
Our Order of May 25, 1989, denying the recusal motion recited that the trial would not be continued beyond June 1, 1989. Nevertheless, in the course of the parties' preparation for trial, discovery problems arose which required that the trial on this matter be again continued until July 25, 1987. At that time it was, in fact, conducted and completed.
At trial, the parties submitted a rather comprehensive Stipulation of Facts, including *526 copies of all relevant loan documents; the following information as to the seven transactions between the parties: the payments made, the cost of insurance, and the rebates of finance charges and insurance charges; and certain undisputed facts elicited in discovery. The Debtor then called six witnesses including herself and five employees of Mid-Penn: Edwin Seave, Esquire, its President; John F. Griffith and Leonard Tench, two of its three Vice-Presidents; and Marian D. Myers and Joyce Moseley, two of its loan closers. (All of these parties are referred to hereinafter by their surnames). Mid-Penn recalled Griffith and Seave in its case.
Since the parties desired to order a Transcript of the trial before commencement of briefing, we were compelled to issue an Order indicating that submissions of proposed Findings of Fact and Conclusions of Law were to be filed at 30-day intervals after trial, and that the Debtor was permitted 15 days thereafter to file a Reply Brief. Ultimately learning of the filing of the Transcript on September 8, 1989, we entered an Order of September 18, 1989, indicating that the submissions described above were due on October 9, November 8, and November 20, 1989, respectively. Although Mid-Penn's submission was one day late, the Debtor submitted her Reply Brief early, on November 17, 1989.
Because certain credibility determinations are relevant to our disposition and due to the dictates of Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52(a), we are obliged to render separate Findings of Fact and Conclusions of Law. The latter will take the form of headnotes to our subsequent legal discussions.
C. FINDINGS OF FACT
1. The relationship of the Debtor and Mid-Penn began on August 16, 1984. Between that date and May 22, 1986, the Debtor obtained loans from Mid-Penn on seven (7) occasions. With respect to the first six (6) loans, the Debtor's late mother, Rosa Lula Bowens (hereinafter "Bowens"), who was never a debtor, was a co-borrower (the Debtor and her mother will be collectively referred to hereinafter as "the Borrowers").
2. Until Bowens' death on January 3, 1986, she and the Debtor were joint owners of their residence, located at 19 North 59th Street, Philadelphia, PA 19139. Upon Bowens' death, the property passed solely to the Debtor by right of survivorship.
3. The first loan from Mid-Penn to the Borrowers, on August 16, 1984, was in the amount of $1,024.58. Insurance charges were $13.22 for life insurance and $37.72 for disability insurance. Official fees charged totalled $24.00. The finance charges, computed at an annual percentage rate (APR) of 23.76, were $292.48. The loan was to be repaid in 24 installments of $58.00, making the total of payments $1,392.
4. After the Borrowers had repaid $116.00 of this loan, they refinanced the balance and obtained a second loan from Mid-Penn on November 29, 1984, in the amount of $549.78.[3]
5. After the Borrowers had repaid $352.00 of the November 29, 1984, loan, they refinanced the balance and obtained a third loan from Mid-Penn on April 11, 1985, in the amount of $1,051.75.
6. Without refinancing any prior loans, the Borrowers obtained a fourth loan from Mid-Penn on April 23, 1985, in the amount of $521.85.
7. After repaying $690.00 toward the April 11, 1985 loan, the Borrowers refinanced the balance and obtained a fifth loan from Mid-Penn on August 29, 1984, in the amount of $541.75.
8. After repaying $120.00 of the April 23, 1985, loan, the Borrowers refinanced the balance and obtained a sixth loan from Mid-Penn on September 17, 1985, in the amount of $531.91.
9. After repaying $864.00 of the August 23, 1985, loan and $406.00 of the September 17, 1985, loan, the Debtor refinanced *527 both loans and obtained a seventh loan from Mid-Penn on May 22, 1986, in the amount of $549.09. At the time of each refinancing, the Borrowers were current on their payments under the loans being refinanced. The Debtor was, apparently, a few payments in arrears in her last loan as of the date of her bankruptcy filing.
10. The relevant terms of each of these loans may be summarized as follows:

 Amount (or No.
 Additional Insurance Charges Official of Total
 Amount) L(life), Fees Finance pay- to be
 Date Borrowed D(disability) Charged Charge APR ments Paid
8/16/84 $1024.58 13.22(L) + 37.72(D) 24 $ 292.48 23.76 24 $1392
11/29/84 549.78 20.06(L) + 57.24(D) 11 422.28 23.79 24 2112
4/11/85 1051.75 31.46(L) + 89.76(D) 20 667.28 23.77 24 3312
4/23/85 521.85 6.84(L) + 19.51(D) 20 151.80 23.85 24 720
8/29/85 541.75 92.79(L) + 178.85(D) 20 2069.92 27.70 48 5184
9/17/85 531.95 13.22(L) + 37.72(D) 20 292.48 23.76 24 1392
5/22/86 549.09 135.17(L) + 264.96(D) 25 3018.40 27.07 48 7680

11. The subsequent developments in all of the above loan transactions between the parties can be summarized in the following manner:

 Amount Treatment of
 Date Amount Borrowed Repaid Prior Loans
 8/16/84 $1,024.58 $ 116.00 no prior loans
 11/29/84 549.78 352.00 refinanced 8/16/84 loan
 4/11/85 1,051.75 690.00 refinanced 11/29/84
 4/23/85 521.85 120.00 new loan
 8/29/85 541.75 864.00 refinanced 4/11/85 loan
 9/17/85 531.91 406.00 refinanced 4/23/85 loan
 5/22/86 549.09 3,378.00 refinanced 8/29/85 and
 _________ _________
 9/17/85 loans (Loan to
 Debtor only)
 TOTAL $4,770.71 $5,926.00

12. In connection with each transaction, Mid-Penn obtained a mortgage on the 19 North 59th Street property as security for the loans. The following chart sets forth the date on which each mortgage was recorded and satisfied:

 Date Date
 Mortgage Mortgage
 Date of Loan Recorded Satisfied
 8/16/84 8/29/84 2/27/88
 11/29/84 12/13/84 never satisfied
 4/11/85 4/22/85 5/4/88
 4/23/85 5/7/85 5/4/88
 8/29/85 9/13/85 5/4/88
 9/17/85 10/11/85 5/4/88
 5/22/86 6/16/86 never satisfied

13. Because it took a security interest in the Borrowers' residence in each transaction, Mid-Penn was obliged to provide the Debtor with a Notice of Right to Cancel *528 each of the transactions under the TILA. See 15 U.S.C. § 1635(a); and Regulation Z (hereinafter "Reg. Z"), 12 C.F.R. § 226.23(a)(1). The Notices provided to the Debtor in each of the transactions other than those of April 11, 1985, and August 29, 1985, complied substantially with the form set forth in Reg. Z, Rescission Model Form (General), Appendix H-8, beginning with the following language:
You are entering into a transaction that will result in a (mortgage/lien/security interest) (on/in) your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from. . . .
14. However, in the transactions of April 11, 1985, and August 29, 1985, the Notice began with the following language:
You are entering into a new transaction to increase the amount of credit provided to you. We acquired a (mortgage/lien/security interest) (on/in) your home under the original transaction and will retain that (mortgage/lien/security interest) in the new transaction. You have a legal right under federal law to cancel the new transaction, without cost, within three business days from whichever of the following events occurs last: . . .
As we have observed in Perkins, supra, 106 B.R. at 868; Jones, supra, 79 B.R. at 235; and Tucker, supra, 74 B.R. at 932, this phraseology is a "hybrid" between Appendix H-8 and Model Form (Refinancing), Appendix H-9 to Reg. Z.
15. In none of these Notices did Mid-Penn advise the Borrowers that it was retaining more than one mortgage in their home as a result of any of the transactions.
16. In connection with each transaction, the Borrowers purchased credit life and disability insurance from Mid-Penn. The following chart summarizes the charges paid by the Borrowers to Mid-Penn for the insurance as well as insurance rebates they received pursuant to each respective refinancing:

 Disability Disability
 Life Ins. Life Ins. Insurance Insurance
 Date of Loan Charge Rebate Charge Rebate 
 8/16/84 $ 13.22 $ 10.18 $ 37.22 $ 29.04
 11/29/84 20.06 14.04 57.24 40.07
 4/11/85 31.46 19.29 89.76 56.85
 4/23/85 6.84 4.33 19.51 12.36
 8/29/85 92.79 61.54 178.85 118.62
 9/17/85 13.22 5.99 37.22 17.10
 5/22/86 135.17 - 264.96 -
 _______ _______ _______ _______
 TOTAL $312.76 $115.37 $685.26 $274.04

By subtracting the rebates from the charges, it can be determined that the Borrowers paid a total of $197.39 for life insurance and $411.22 for disability insurance in these transactions.
17. In discovery, Mid-Penn disclosed that, in all loans made by it in June and July, 1985, it sold life insurance to 885 of 889, or 99.55% percent, of borrowers eligible for same. It further stipulated that these figures were "representative" of its statistics for the full year 1985.
18. Mid-Penn also disclosed in discovery, but nowhere in its disclosures to borrowers, that it received commissions equal to twenty-seven (27%) percent of the sale price for each life insurance policy and twenty-one (22%) percent of the sale price for each disability insurance policy sold to the Borrowers.
19. The Debtor is a 40-year-old woman, re-married as of June 11, 1988, who is a graduate of high school and of a six-month course from a training center for computer data entry and who also attended community college for one year. She is employed full-time as a data entry operator and parttime *529 as a pianist for various church choirs. She presented herself as of average intelligence, but not inquisitive in nature and rather passive.
20. Admitted into evidence were advertisements which Mid-Penn sends to each of its current customers about twice monthly, urging them to borrow additional sums from it for appropriate seasonal needs, such as purchasing school items, Easter clothing, and taking summer vacations. Many of these advertisements contain a purported signature of "Ms. Cash," a pseudonym of a Mid-Penn employee.
21. Although these advertisements may have been of some influence upon the Debtor, she stated that the purposes of the refinancings of the loans were payment of home repairs, utility bills, purchasing a car, and buying a tombstone for her mother, purposes not suggested on any of the advertisements. On one occasion, apparently in the period between 1984 and 1986, she made a loan with another loan company because a roofing contractor referred her there.
22. The Debtor credibly testified that no employee from Mid-Penn ever explained to her that she might have to pay less if she made a separate, new loan from Mid-Penn rather than continuously refinancing her previous loans. On the only occasion on which a new loan was written while another loan was outstanding (April 23, 1985), Bowens was the principal borrower, while the Debtor had been the principal borrower on the prior loans. However, the Debtor never testified that she would have preferred Mid-Penn to have written any of the loans differently, or to have given her a new, separate loan instead of refinancing a previous loan in any particular transaction.
23. The Debtor also credibly testified that life and disability insurance was always included in the documents executed in her loan transactions without her having requested same; that no terms of the transactions except the number and amount of payments were clearly explained to her by Mid-Penn's agents; and that she had never been informed that Mid-Penn was collecting commissions from the insurers. Although the Debtor stated in somewhat uncertain fashion that she had not wanted the credit insurance purchased, it appeared that this in large part due to the fact that she erroneously believed that her mother was the party whose life and health was insured, not (as was the case) she herself. It is not clear at all that the Debtor renounced any desire for the protection that such insurance gave her mother in all but the last transaction.
24. The Debtor provided no testimony indicating that she was surprised that Mid-Penn had taken multiple mortgages against her property or of any adverse effects to her therefrom.
25. Seave and Griffith both postulated several reasons why customers would prefer refinancing as a means of obtaining additional cash as opposed to making new, separate loans, i.e., the convenience of one payment; the propensity of such loans to reduce monthly payments, albeit that the total payments were greater; and the avoidance of perpetual multiple mortgages against the borrower's premises.[4] However, Griffith conceded that, if the terms of new loans were extended for longer periods, a reduction of monthly payments could be accomplished.
26. Mid-Penn is able to realize significantly greater profits if loans are refinanced when customers seek more cash as opposed to providing them with new loans for the additional cash. The Debtor has calculated (and Mid-Penn has not disputed those calculations) that her total debt was increased by $3,037.43 as a result of refinancing her previous loans, as opposed to providing her with new additional loans on each occasion of refinancing.
*530 27. Griffith initially testified that he always offers customers the option of making a new loan as opposed to a refinancing. However, he later conceded (and Byers and Moseley agreed with this later testimony) that the prospect of making a new loan as opposed to refinancing is described only if the customer raises the issue, and that it is unusual that a customer does raise this issue and hence whether any option other than refinancing is utilized. We believe that the foregoing sentence accurately describes Mid-Penn's policies in this regard.
28. None of Mid-Penn's witnesses testified that they explained the insurance options to customers or revealed to them that Mid-Penn received any commissions on insurance sales. Seave testified that almost all customers desired life insurance but many customers do not desire and reject the disability insurance because they have other comparable coverage.
29. Mid-Penn's forms clearly state that neither life nor disability insurance is required to be purchased by the borrower, and that the borrower must sign a separate affirmative intention to choose the option of purchasing the insurance, which the Borrowers did in each of the transactions in issue. It also forwarded copies of insurance policies to the Borrowers in each transaction which disclosed the coverage and beneficiaries in each instance.
30. By separate letters respectively dated as follows, the Debtor, by her counsel, demanded rescission of the refinancing transactions of April 11, 1985 (letter dated April 11, 1985); April 23, 1985 (letter dated April 21, 1985); and August 29, 1985; September 17, 1985; May 22, 1986 (three letters dated July 11, 1988). On April 29, 1988, Mid-Penn, by its counsel's letters, indicated a refusal to rescind the first two above-referenced loans, and, by letters of July 25, 1988, refused to rescind the last three above-referenced loans.
D. THIS PROCEEDING IS CORE IN NATURE AND WE CAN CLEARLY DETERMINE IT.
As it is in the form of an objection to Mid-Penn's secured proof of claim, this proceeding is uncontestably core in nature pursuant to 28 U.S.C. § 157(b)(2)(B). The fact that the Debtor raises significant claims against Mid-Penn and ultimately is awarded a significant monetary recovery against Mid-Penn does not change this result, because counterclaims to proofs of claim are also within the scope of core proceedings. 28 U.S.C. § 157(b)(2)(C). See, e.g., In re Direct Satellite Communications, Inc., 96 B.R. 507, 515 (Bankr.E.D. Pa.1989); and In re Russell, 72 B.R. 855, 857-58, 873 (Bankr.E.D.Pa.1987). We are therefore empowered to fully determine as well as hear this proceeding.
E. AS A RESULT OF ITS RATHER CLEAR MATERIAL VIOLATIONS OF TILA IN FAILING TO DISCLOSE THAT IT WAS TAKING MULTIPLE MORTGAGES AGAINST THE BORROWERS' RESIDENCE IN THE FOUR RELEVANT REFINANCING TRANSACTIONS AND ITS REFUSAL TO ACT UPON THE DEBTOR'S VALID RESCISSIONS OF THESE TRANSACTIONS, MID-PENN LOSES ITS SECURITY INTEREST AND CLAIM AGAINST THE DEBTOR AND IS RENDERED LIABLE TO THE DEBTOR FOR MONETARY DAMAGES TOTALLING $4,957.14.
As we observed in Tucker, supra, 74 B.R. at 924, 932-34, whether "fair" or not, the consequences to Mid-Penn of its failure to disclose, in its Notice of the Debtor's right to rescind, that it has taken and will retain multiple mortgages against the Borrowers' residence in each of the refinancing transactions between the parties is nothing short of disastrous to its interests. See also In re Brown, Brown v. Credithrift of American Consumer Discount Co., 106 B.R. 852, 861-62 (Bankr.E.D.Pa. 1989). Our observations regarding potential "unfairness" to Mid-Penn is tempered, however, by our recitation, in Perkins, supra, at 867-70, of the history of Mid-Penn's refusal to correct the TILA violations effected by retaining multiple mortgages despite a series of decisions adverse to its position that its practices were not in *531 violation of the law, beginning with the decision in Bookhart v. Mid-Penn Consumer Discount Co., 559 F.Supp. 208 (E.D. Pa.), on January 31, 1983. Since the filing of our Opinion in Perkins on November 9, 1989, the Third Circuit Court of Appeals has added the affirmance of the district court and our decision in Nichols to the string of setbacks suffered by Mid-Penn on this issue. In addition to Nichols, Jones, Tucker, and Bookhart, other decisions in this line of cases include Gill v. Mid-Penn Consumer Discount Co., 671 F.Supp. 1021 (E.D.Pa.1987), aff'd, 853 F.2d 917 (3d Cir.1988); In re Abele, 77 B.R. 460 (E.D.Pa.1987), aff'd, 845 F.2d 1009 (3d Cir. 1988); and In re Growells, Growells v. Mid-Penn Consumer Discount Co., Bankr. No. 87-02714F, Adv. No. 87-0592F, (Bankr.E.D.Pa. July 26, 1989) (FOX, J.). Therefore, the Court of Appeals has, on three occasions, rejected efforts of Mid-Penn to protest decisions of this court and the district court rendering it liable for the same or similar TILA violations.
The principle argument raised in defense here is the alleged exculpatory impact of the new adjunct to ¶ 226.23(b)(3) in the Official Staff Commentary on Regulation Z Truth in Landing (hereinafter "the Commentary"), which became effective on March 3, 1989, and provides that a creditor need not disclose multiple security interests which it holds in any particular property in the rescission Notice. The argument that this Commentary should be enforced retroactively, i.e., be applied to transactions, as are in issue in this proceeding, which were consummated prior to March 3, 1989, was considered at length and rejected by this court in Perkins, 106 B.R. at 870-74. The correctness of the result in Perkins is now settled in this Circuit by the subsequent decision of the Court of Appeals in Nichols.
As we observed in Perkins, 106 B.R. at 868 n. 7, the Commentary would not, in any event, affect the force of the decisions in Jones, supra, 79 B.R. at 235, 240; and Tucker, supra, 74 B.R. at 931, that the use of a "hybrid" between the Appendix H-8 and the Appendix H-9 model rescission forms when a loan is refinanced in its entirety, as in the instant refinancing transactions, is inappropriate, and what must be used is the Appendix H-8 model form. See Perkins, supra, 106 B.R. at 869 n. 13. Since the "hybrid" form was used in the April 11, 1985, and the August 28, 1985, transactions in issue here, these transactions are eminently rescindable.
While Mid-Penn correctly utilized the Appendix H-8 form in the transactions of September 17, 1985, and May 22, 1986, it failed to disclose, in the Notices of the right to rescind these transactions, that it was retaining multiple mortgages against the Borrowers' residential realty therein. At the time of the September 17, 1985, transaction, as indicated by the chart reproduced at Finding of Fact 12, page 527 supra, Mid-Penn retained five mortgages against the Borrowers' realty. By the time of the May 22, 1986, transaction, the number of mortgages taken had risen to six. None of the mortgages were satisfied until February 27, 1988. Two remain of record today. Compare Perkins, supra, 106 B.R. at 874 (retention of at least one mortgage in addition to that taken in the current loan transaction for a substantial period after that transaction must be disclosed in the rescission Notice).
However, the April 23, 1985, transaction stands on a different footing. It was not a refinancing transaction. Therefore, Mid-Penn's retention of multiple mortgages from an entirely different loan stream had no relevance to this transaction and need not have been disclosed in the rescission Notice accompanying this transaction. The argument advanced by the Debtor relating to her alleged right to rescind this transaction is based solely upon the hypothesis that the insurance purchased by the Debtor was not in fact optional, but was required, and therefore should have been disclosed as part of the finance charge imposed in the transaction. For reasons which we will develop in more detail in our discussion of the Debtor's claims regarding the insurance sold to her in these transaction at pages 539-43 infra, we reject these claims. Consequently, only the four remaining transactions which the Debtor *532 sought to rescind are in fact properly rescindable.
The consequences of our conclusion that four of the transaction in issue are rescindable, and that Mid-Penn failed to properly respond thereto by acknowledging the Debtor's right to rescind these transactions, are considerable, as we explained most recently in Perkins, supra, 106 B.R. at 874-75; and Brown, supra, 106 B.R. at 861-62. Moreover, as in Abele, supra, 77 B.R. at 461-62, 468-70, the consequences are magnified by the multitude of refinancings which occurred; the Debtor's valid rescissions of several transactions in a sequence of refinancings; and Mid-Penn's refusal to recognize the validity of any of the refinancings.
Firstly, the two mortgages taken as security by Mid-Penn which have not been satisfied must now be directed to be satisfied. See 15 U.S.C. § 1635; 12 C.F.R. § 226.23(d)(1); and Perkins, supra, 106 B.R. at 874, and cases cited therein. Secondly, all finance charges imposed in the validly rescindable transactions must be eliminated. See id. Thirdly, Mid-Penn is obliged to pay statutory damages to the Debtor in each rescindable transaction as a result of its refusal to properly respond to the Debtor's rescission demands. See Perkins, supra, 106 B.R. at 874-75, and cases cited therein. Finally, Mid-Penn is liable to the Debtor's counsel for reasonable attorneys' fees. 15 U.S.C. § 1640(a)(3); and Perkins, 106 B.R. at 874-75, and cases cited therein.
In addition, the Debtor requests that we eliminate Mid-Penn's claim entirely and direct it to repay to the Debtor the $3,378 sum which she paid towards the balance on the last of the sequence of loan transactions. These requests for relief remedy constitute claims that we explained were potentially available to the similarly-situated consumers in Perkins, supra, 106 B.R. at 874-75; Brown, supra, 106 B.R. at 862; and Tucker, supra, 74 B.R. at 933, but were not awarded because, inter alia, the respective debtors made no requests for same.
It is easy to conclude, in light of the foregoing, that Mid-Penn must be directed to satisfy the two remaining mortgages and thus be reduced to no better than the status of an unsecured creditor in the Debtor's bankruptcy case. It also seems apparent that the parties' stipulation of the accuracy and pertinency of the figures recited in Finding of Fact 11, page 527 supra, reveals that the Debtor has paid more to Mid-Penn than the total amount that she borrowed. Therefore, Mid-Penn's unsecured claim is wiped out entirely, even if we decline to apply recoupment or the holding of Gill, supra, 671 F.Supp. at 1026; and In re Gurst, 79 B.R. 969, 979 (Bankr.E. D.Pa.1987), appeals dismissed, 866 F.2d 1410 (3d Cir.1988); and 88 B.R. 57 (E.D.Pa. 1988), that a failure to properly acknowledge a valid rescission results in elimination of the principal debt owed.
It is also clear that Mid-Penn must pay statutory damages of $4,000 to the Debtor, plus reimburse her counsel for reasonable attorneys' fees. One issue remains: how much, if anything, should Mid-Penn be obliged to refund to the Debtor over and above these sums? In Perkins, supra, 106 B.R. at 874; Brown, supra, 106 B.R. at 862; Jones, supra, 79 B.R. at 241; and Tucker, supra, 74 B.R. at 932, 933, without apparent dispute from the lenders,[5] we deducted the total amount paid from the net amounts received by the borrowers in the pertinent loans to measure the net sum due to the lenders.
Here, the Borrowers' unusually good payment record results in a negative sum, even when no allowance for any of the charges imposed in the non-rescindable April 23, 1985, transaction are factored in. The Debtor paid $5,926.00. She borrowed a total of $4,770.71. The insurance, fees, and finance charges of the April 23, 1985, transaction which cannot be rescinded and *533 must be credited to Mid-Penn totalled $198.15. Therefore, Mid-Penn is obliged to refund $5,926  ($4,770.71 + $198.15) to the Debtor, or $957.14.
Although we clearly could, as the Debtor requests, direct Mid-Penn to refund the $3,378.00 paid by the Debtor to Mid-Penn on her current loan, we shall refrain from doing so, as we did in the face of a similar request in Gurst, supra, 79 B.R. at 979. We believe that elimination of its entire claim against the Debtor, plus imposition of liabilities of $4,957.14 and an untold substantial sum to her counsel for reasonable attorneys' fees would render it inequitable, see 15 U.S.C. § 1635(b) (last sentence); 12 C.F.R. § 226.23(d)(4); and Tucker, supra, 74 B.R. at 933, to impose any additional liability upon Mid-Penn for its actions here which were violative of the TILA. Hence, the award of $4,957.14 is the full extent of what we will award the Debtor for damages under the TILA.
F. THE DEBTOR NEED PROVE ONLY THAT MID-PENN ENGAGED IN PERVASIVE UNFAIR CONDUCT TO RENDER IT LIABLE TO HER ON HER CLAIMS UNDER UDAP.
We now turn to the Debtor's statelaw claims against Mid-Penn. As in Nichols, slip op. at 3 [___ F.2d ___ (table)]; Jones, supra, 79 B.R. at 237-39; and Tucker, supra, 74 B.R. at 927-28, although we acknowledge certain equities in the Debtor's positions, we are unable to give her very substantial relief under state law. In the three cases cited supra, the result was mandated by rather clear provisions of applicable state law authorizing Mid-Penn's practices. Here, we are restricted by the rather poor factual record made by the Debtor, particularly in her own testimony relative to these transactions.
The Debtor claims that three separate actions and practices of Mid-Penn violate 73 P.S. § 201-2(4)(xvii) of UDAP, which provides, in pertinent part, that
(4) . . . unfair or deceptive acts or practices: mean only one or more of the following:
. . . . .
(xvii) Engaging in any other fraudulent conduct which creates a likelihood of confusion or misunderstanding.
The Pennsylvania Supreme Court, in Commonwealth v. Monumental Properties, Inc., 459 Pa. 450, 470, 329 A.2d 812, 826 (1984), established that the foregoing UDAP "catchall" provision was "designed to cover generally all unfair and deceptive acts or practices in the conduct of trades or commerce." The court further noted, 459 Pa. at 462 n. 14, 329 A.2d at 818 n. 14, that UDAP provides that "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." 73 P.S. § 201-3. The court further held that "[as] a statute for the prevention of fraud, it must be liberally construed to effect the purpose . . .," 459 Pa. at 477, 329 A.2d at 826, and that "fraudulent conduct that would mislead or confuse a consumer was banned." Id., 459 Pa. at 467, 329 A.2d at 820.
Mid-Penn argues that, for there to be liability under the foregoing "catchall" section of UDAP, the consumer must prove the existence of common-law fraud, which it suggests requires something considerably more than the presence of unfair conduct on its part. However, the Pennsylvania Supreme Court, in Monumental Properties, 459 Pa. at 461, 329 A.2d at 817, held that Pennsylvania's UDAP "has regularly been interpreted . . . as being based on the Federal Trade Commission [hereinafter `FTC'] Act." Following upon this holding in In re Andrews, 78 B.R. 78, 82 (Bankr.E. D.Pa.1987), this court adopted the Supreme Court's interpretation of the FTC Act in FTC v. Algoma Lumber Co., 291 U.S. 67, 79-81, 54 S.Ct. 315, 320-21, 78 L.Ed. 655 (1934), "that the innocence of the motives of the defendant is irrelevant to the determination of whether there has been an actionable UDAP violation, and that `there is a kind of fraud, as courts of equity have long perceived, in clinging to a benefit which is the product of misrepresentation.'" See also FTC v. Colgate-Palmolive Co., 380 U.S. 374, 390-92, 85 S.Ct. 1035, 1045-46, 13 L.Ed.2d 904 (1965).
*534 In Andrews, 78 B.R. at 83, we concluded that the borrower need not prove actual fraud to have a UDAP cause of action. Rather, we held that proof of any violation of a consumer protection act or any pervasive violation of the terms of a contract was sufficient to give rise to a cause of action under UDAP. See also In re Clark, 96 B.R. 569, 581-82 (Bankr.E.D.Pa.1989) (pervasive breaches of implied warranty of habitability by a slumlord-debtor constitute a violation of UDAP); In re Wernly, 91 B.R. 702, 704 (Bankr.E.D.Pa.1988) (any illegal conduct or conduct in violation of contract terms is actionable under UDAP, despite the lack of a finding of fraudulent intent); In re Stewart, 93 B.R. 878, 887 (Bankr.E.D.Pa.1988) (violation of any of Pennsylvania's consumer protection laws is per se an unfair trade practice violative of UDAP); and In re Russell, 72 B.R. 855, 871 (Bankr.E.D.Pa.1987) (same).
The Third Circuit Court of Appeals, in In re Smith, 866 F.2d 576, 581-86 (3d Cir. 1989), carefully reviewed the applicable law interpreting the scope of Pennsylvania's UDAP. The Court approved, in its interpretation of UDAP, the previously-referenced interpretations of FTC Act and of UDAP by this court, specifically including Andrews, supra; In re Jungkurth, 74 B.R. 323, 334-36 (Bankr.E.D.Pa.1987), aff'd, 87 B.R. 333 (E.D.Pa.1988); and Russell, supra, which extended the scope of UDAP to loans secured by mortgages. 866 F.2d at 581-82. Addressing the issue of what sort of conduct must be proven to give rise to a cause of action under UDAP, the Smith court states, id. at 583, that
in order to evaluate whether [the defendant] has violated [the "catchall"] subsection of UDAP, we must measure its conduct against the elements of common law fraud, which require that a party makes a material representation that another reasonably relies upon to his or her detriment.
However, a closer analysis of the facts and holding in Smith reveal that the court interpreted the term "common law fraud" broadly. The court noted that the lender and the borrower in issue had enjoyed an amicable relationship for seventeen (17) years which resulted in almost full satisfaction of a mortgage. Id. at 584. Despite this long relationship and the Debtor's assurances that she would cure any delinquencies in her loan, the lender "swiftly and silently commenced foreclosure and soon thereafter obtain a `snap' default judgment against an unwary and unsuspecting borrower." Id. at 584.
The Third Circuit determined that this conduct of the lender rose to the level of fraud because it was substantially unfair, stating, id. at 584, as follows:
A borrower of money, especially the owner of a residential property mortgaged to a lending institution, may reasonably expect that he or she will receive fair and aboveboard treatment in their dealings and that no undue advantage will be taken by the lender. Here, Fidelity did not accord Smith such fair treatment.
. . . We hold that [the lender's] conduct is "unfair" in the most basic sense of the word and fraudulent within the meaning of UDAP.
Hence, the court, in Smith, supra, found that the borrower had an actionable claim under § 201-2(4)(xvii) of UDAP based upon the lender's unfair conduct. Id. Obviously, the court thus determined that the fraud requirement of UDAP § 201-2(4)(xvii) was satisfied by its finding of unfair conduct on the part of the defendant. It thus reached a result very close to, if not identical with, that reached by this court in Andrews, Stewart, and Russell, where we held that a borrower need prove only that a lender engaged in pervasive illegal conduct to state a cause of action under § 201-2(4)(xvii) of UDAP.
The Debtor alleges three practices of Mid-Penn which it claims are so pervasively unfair to her as to constitute civil claims under UDAP, thus giving rise to the civil treble-damage provision set forth in 73 P.S. § 201-9.2(a) of that statute:
1. Encouraging excessive refinancing of loans of its borrower-customers through (a) copious advertisements urging them to make new loans; (b) failing to disclose to *535 borrowers the advantages to Mid-Penn itself and the disadvantages to them from refinancing, due to the computation of rebates of finance charges and insurance on pervious loans under the "Rule of 78's," see Jungkurth, supra, 74 B.R. at 333-34; and (c) refraining from presenting the alternative to the borrowers of making new supplemental loans instead of refinancings, which would avoid the impact of the Rule of 78's.
2. Continuing to retain multiple mortgages against borrowers who refinance loans despite uniform condemnation of this practice by the courts.
3. Effectively requiring borrowers to purchase life and disability insurance, while precluding charges for such insurance from the finance charges in its loans on the basis of forms which unobtrusively provide that insurance purchases are voluntary.
We will examine each of these practices in turn.
G. MID-PENN'S PRACTICE OF ENCOURAGING ITS CUSTOMERS TO REFINANCE PREVIOUS LOANS AND NOT DISCLOSING TO THEM THE ATTRACTIVE FEATURES OF THE ALTERNATIVE OF MAKING A NEW SUPPLEMENTAL LOAN, WHILE NOT ANALOGOUS TO "CHURNING" OF SECURITY ACCOUNTS AND NOT PROVEN TO BE INJURIOUS TO THIS DEBTOR TO THE DEGREE CLAIMED BY HER, IS A PERVASIVELY UNFAIR PRACTICE VIOLATIVE OF UDAP, ENTITLING THE DEBTOR TO THE MINIMUM CIVIL DAMAGES ALLOWABLE UNDER UDAP.
The Debtor first claims that Mid-Penn violated the "catchall" provision of UDAP by encouraging her to continuously refinance her loans. We discussed the benefits flowing to Mid-Penn as a result of this practice at some length in Tucker, supra, 74 B.R. at 925-27. In Tucker, the borrowers obtained a loan from Mid-Penn which they refinanced on two occasions, obtaining additional advances of $2,027.88. For these additional advances, the borrowers obligated themselves to repay Mid-Penn $6,720.00 more than they had in the original transaction. Id. at 926-27. This was possible largely due to the impact of the use of the "Rule of 78's" to compute rebates due on the previous obligation to be refinanced, the use of which is specifically authorized by the state law pursuant to which the loans were written, the Pennsylvania Consumer Discount Company Act (hereinafter "the CDCA"), 7 P.S. § 6214 D. See Jones, supra, 79 B.R. at 237-38. As we explained in Jungkurth, supra, 74 B.R. at 334, "it is uncontrovertible that the Rule [of 78's] is an inaccurate measure of actual rebate to the detriment of borrowers" despite the fact that "some Pennsylvania laws [including the CDCA] . . . expressly authorize its use." We therefore concluded, in Tucker, 74 B.R. at 927, that
[t]he properly pejorative designation of the practice of inducing borrowers to rewrite loans as frequently as possible, i.e., "flipping," may well appropriately characterize the conduct or [Mid-Penn] here.
The loans in Tucker were "flipped" twice. We stated, id. at 927-28, that
the likely conduct of [Mid-Penn] here in inducing two re-writes of the original loan shortly after it was made was at best opportunistic and at worst unfairly deceptive. However the debtor has not invoked [UDAP]. . . . [6]
The behavior that we characterized as "opportunistic" and "unfairly deceptive" in Tucker, was done on five occasions in the proceeding sub judice, as opposed to twice in Tucker. The Debtor's original loan was "flipped" three times; the "new" April 23, 1985, loan, in which Bowens was the principal borrower, was itself "flipped" once; and finally both of these loan streams were combined in a final massive "flip," all within a 21-month period. The total amount borrowed by the Debtor was $4,770.71. If the Debtor had borrowed this amount as *536 one 48-month loan at 24.81% APR (the average interest rate for the seven loans), the total repayment due to Mid-Penn would have been $7,569.09 rather than the present $10,606.52. See Finding of Fact 26, page 529 supra. By refinancing the Debtor's loans, Mid-Penn thus arguably increased its profits by $3,037.43 (and, in the process, obtained seven separate mortgages on the Borrowers' residence).
In search of authority to support an award of damages to the Debtor as a result of Mid-Penn's conduct, the Debtor attempts to analogize Mid-Penn's conduct to the "churning" of an investment account by a securities dealer. Unfortunately, the impact of this inapt analogy magnifies the deficiencies of the proof on this record that Mid-Penn has engaged in conduct which is actionable as well as opportunistic.
Traditionally, allegations of "churning" are made against security brokers who abuse their position to make discretionary decisions concerning the number and type of transactions made on behalf of an investor by making an excessive number of sales and thereby increasing their own commissions. See, e.g., Armstrong v. McAlpin, 699 F.2d 79, 90 (2d Cir.1983); Powers v. Francis I. DuPont & Co., 344 F.Supp. 429, 432-32 (E.D.Pa.1972); and Moscarelli v. Stamm, 288 F.Supp. 453, 456-58 (E.D.N.Y.1968). Further,
[i]n order to establish a claim of churning, a plaintiff must show (1) that the trading in his account was excessive in light of his investment objectives; (2) that the broker in question exercised control over the trading in the account; and (3) that the broker acted with the intent to defraud or with the wilful and reckless disregard for the interests of his client.
Mihara v. Dean Witter & Co., 619 F.2d 814, 821 (9th Cir.1980). See also Rolf v. Blyth Eastman Dillon & Co., 424 F.Supp. 1021, 1039-40 (S.D.N.Y.1977).
The most basic ingredient of a claim of "churning" is establishing that the securities dealer charged has complete control over the account of a customer. Comment, Churning by Securities Dealers, 80 HARV.L.REV. 869, 871-74 (1967). All or most transactions in a sequence of securities-sales transactions properly characterized as "churning" must be effected by the dealer himself. Id. at 871.
We conclude that Mid-Penn did not have the type of discretionary control over the Debtor's finances that churning requires. Mid-Penn did not personally recommend that the Debtor borrow additional funds. Rather, it submitted impersonal advertisements to her, and then responded to her specific requests. In each refinancing transaction, the Borrowers approached Mid-Penn, not vice versa.
The Debtor further maintains that the advertisements she received from Mid-Penn induced her to return to Mid-Penn to seek additional loans and, considered together with Mid-Penn's opportunistic conduct, was comparable to churning. We do not agree. As stated by the court in Commonwealth ex rel. Zimmerman v. Nickel, 26 D. & C.3d 115, 123-24 (Mercer Co. C.P. 1983), a letter of enticement is not a violation of UDAP. In Zimmerman, the defendant sent a notice to consumers informing them that they had won a prize which they had to retrieve at their recreational campground known as Plantation Park. Id. at 123. The plaintiffs claimed that the letter of enticement and the hard-sell pressure tactics of the defendants upon the plaintiff's arrival at Plantation Park to sell them a park membership violated UDAP. Id. Although acknowledging that UDAP § 201-2(4)(xvii) is to be interpreted broadly, the Nickel court refused to find that the letter and salesmanship tactics violated that law. Id. at 123-24. In so holding, the court allowed that only "sales tactics consisting of gimmicks intentionally designed to cause confusion and misunderstanding when alleged and proven do violate UDAP." Id. at 124.
We do not find that Mid-Penn's advertisements were the sort of "gimmicks" referenced in the passage quoted in the foregoing sentence from Nickel. They were merely generalized invitations to consumers to make loans, similar to those which any business might publish in a newspaper or magazine, which the consumers were *537 free to disregard. We do not believe that the introduction of the obvious pseudonym, "Ms. Cash," into those advertisements renders these ads false or fraught with gimmicks. Advertising is a major marketing tool utilized by most businesses and consumers are expected to exercise personal restraint when choosing how to respond thereto.
The testimony of the Debtor did not indicate that she considered herself to have been deceived in any way by Mid-Penn's advertisements. They appear to have merely served the function of causing her to return to Mid-Penn when she needed funds to pay for a grave marker for her mother, a car, home repairs, and utility bills, purposes largely not suggested by the advertisements themselves. Although the Debtor chose to return to Mid-Penn to meet her financial needs, she easily could have gone to another loan company to do so, as she did when she had her roof repaired. See Finding of Fact 21, page 529 supra. We conclude, therefore, that Mid-Penn's combination of sending advertisements to the Debtor and being readily available to repeatedly refinance her loans did not rise to the level of "churning" or intentional creation of confusion.
However, there is one aspect of Mid-Penn's practices in reference to its refinancing practices which not only troubles us, but we believe does constitute an unfair trade practice within the scope of UDAP. Although witnesses such as Griffith appeared to be reluctant to admit it, it became apparent, through the recantation of Griffith of his earlier testimony on this point and the testimony consistent with his recanted testimony by Byers and Moseley, see Finding of Fact 27, page 530 supra, that Mid-Penn's employees consistently proposed to customers that they refinance their previous loans instead of making new loans and failed to disclose to them, in any manner, the advantages to Mid-Penn and the disadvantages to them from this practice. The fact that Griffith was initially unwilling to admit this fact reveals his own discomfiture with Mid-Penn's practice of not mentioning any alternatives to refinancing to customers. Moreover, it is apparent that, because of the impact of the Rule of 78's in the calculation of rebates, the advantages to Mid-Penn are manifest. The Debtor has alleged and we have found, at Finding of Fact 26, page 529, supra, and pages 535-36 supra, that the Debtor incurred an additional obligation of $3,037.43 by the refinancing of her loans. Therefore, it is plain to see that Mid-Penn receives a distinct and unfair benefit from this practice.
There is clearly authority for the proposition that a lender's failure to disclose available options to a borrower which would decrease the borrower's cost of obtaining credit may be an unfair trade practice. In Besta v. Beneficial Loan Co. of Iowa, 855 F.2d 532 (8th Cir.1988), the borrower approached a loan company in order to refinance a previous loan and obtain an additional $500 loan to finish her basement. Id. at 533. The borrower offered her a refinancing transaction (Loan II) which extended her current loan over a six-year period. It failed to disclose to her the option of obtaining a three-year loan which an expert witness testified would have resulted in a considerably lower total sum of payments and a lower monthly payment. Id. at 534. In reversing dismissal of the case, the court held as follows, id. at 535:
While we think Loan II was substantively unfair because there was no reasonable basis for writing the loan for a six-year period, we need not based our decision on such a finding. Instead, we hold that not telling Besta that she could have repaid the same loan with lower monthly payments in one-half the time deprived her of fair notice and amounted to unfair surprise  clearly no person in her senses would have accepted the more expensive term. This constituted, at least, procedural unconscionability.
Thus, the Besta lender's failure to disclose the three-year option as held to be violative of Iowa's UDAP, and the lender was limited to the security and repayment of only those amounts that would have been payable under the three-year loan option. Id. at 536.
*538 The reasoning of the Besta case and its holding that a lender has the duty to at least disclose more economical feasible options to borrowers is found in numerous other authorities. In Browder v. Hanley Dawson Cadillac Co., 62 Ill.App.3d 623, 379 N.E.2d 1206, 1210-12, 20 Ill.Dec. 138, 142-44 (1978), the court held that customers of an auto dealership stated a cause of action under the Illinois UDAP in alleging, inter alia, that the dealership failed to disclose the availability of cheaper but comparable credit life insurance policies to its customers. The dealership also failed to disclose that it received a ten (10%) percent rebate on funds disbursed on sales of its own, more expensive policies, thus causing it to prefer these policies for its own benefit. Accord, Robinson v. Rebsamen Ford, Inc., 258 Ark. 935, 530 S.W.2d 660 (1975). See also Bair v. Public Service Employees Credit Union, 709 P.2d 961, 962 (Colo.App. 1985) (lender has duty to disclose type and amount of insurance coverage provided and its failure to do so violated state UDAP); Fox v. Industrial Casualty Insurance Co., 98 Ill.App.3d 543, 424 N.E.2d 839, 840-41, 54 Ill.Dec. 89, 90-91 (1981) (the failure of insurance agents to disclose superior coverage and cost of alternative policies violates state UDAP); and State v. Ralph Williams North West Chrysler Plymouth, Inc., 87 Wash.2d 298, 553 P.2d 423, 442 (1976) (en banc) (auto dealer's failure to advise customers of availability of cheaper joint credit life insurance policies instead of individual policies is violative of state insurance law).
Also supportive of the result reached in Besta is a line of our own cases. In Wernly, supra, 91 B.R. at 704, we held that a check cashier's overcharges were so unconscionable as to be violative of Pennsylvania's UDAP. Similarly, in Stewart, supra, 93 B.R. at 887, we held that a retailer marked up his prices of appliances to his credit customers to such an extent that he violated UDAP. Finally, interpreting comparable New Jersey law in a recommendation approved by Chief Judge Fullam of the district court in In re Fleet, 95 B.R. 319, 335-36 (E.D.Pa.1989), we held that a self-styled "consumer protection agency" which charged its clients fees for the worthless service of referring them to mediocre bankruptcy lawyers engaged in unconscionable practices violative of UDAP. Thus, we have consistently held that imposing charges for services which could be obtained much more inexpensively through readily-available alternatives is violative of UDAP.
We believe that Mid-Penn's regular business practice of failing to advise borrowers such as the Debtor of the advantages to it and the disadvantages to the borrowers of refinancing fit into the same category as the similarly opportunistic practices discussed in the foregoing cases, particularly those described in Besta, supra. We therefore conclude, with little hesitancy, that Mid-Penn's practices in this regard constitute unfair practices which rise to the level of those condemned by the "catchall" provision of Pennsylvania's UDAP.
As we observed in Finding of Fact 25, page 529 supra, Seave and Griffith claimed that refinancing loans actually benefits a borrower because it means that the borrower will be required to make only one monthly payment to Mid-Penn rather than two or more, and that the single monthly payment will generally be of a smaller dollar amount than two separate payments. They also cite, with some irony, see pages 530-31, the fact that refinancing may allegedly avoid Mid-Penn's obtaining simultaneous multiple mortgages against the borrowers' residences. These hypothetical benefits are of course offset here by Mid-Penn's realization of increased profits of over $3,000 from the Debtor as a result of the refinancings.
The instant record is barren of any evidence that the benefits to borrowers enumerated by Seave and Griffith were not in fact considerations which the Borrowers here took into account in the refinancing of their loans. There is thus little indication on this record that the Debtor would not have chosen refinancing as an alternative to making new loans to obtain extra funds advanced in these transactions even if she had been apprised of the detriment to her of increasing the total amount to be paid by her to Mid-Penn as a result of the refinancings. The Debtor also revealed her own *539 awareness of the alternative of obtaining new loans to obtain extra funds in two ways. First, she participated in the April 23, 1985, transaction which reflected the making of a new loan. Second, as we observed in Finding of Fact 21, page 529 supra, she effectively obtained a new loan by making a loan from another loan company in the midst of her refinancing cycle with Mid-Penn. She could have obtained the same "benefit" of making a new loan by making loans for each additional advance reflected in the refinancings from other loan companies.
As we indicated at pages 536-37 supra, we find insufficient evidence in this record to support the Debtor's theory that Mid-Penn's advertising and method of operation spins a web of deception which relentlessly snares borrowers. We therefore decline the Debtor's invitation to conclude that every penny of the more than $3,000 realized by Mid-Penn from refinancings of the Borrowers' various loans are actual damages caused to her by Mid-Penn's UDAP violation of failing to disclose the alternatives to refinancing.[7]
Instead, we find that we are unable to quantify the damages caused to the Debtor as a result of the aforesaid UDAP violations. Consequently, we conclude that Mid-Penn is only liable to the Debtor for the $100 minimum figure set forth in 73 P.S. § 201-9.2(a) for failing to disclose the alternatives to refinancing to the Debtor in each of the five refinancing transactions. Therefore, we will award the Debtor only one additional $500 as damages for Mid-Penn's UDAP violations in failing to disclose alternatives to refinancing to her.
H. THE DEBTOR HAS FAILED TO ESTABLISH THAT MID-PENN REQUIRED THE DEBTOR TO PURCHASE DISABILITY INSURANCE IN THE INSTANT LOAN TRANSACTIONS OR OTHERWISE VIOLATED ANY LAWS IN ITS SALES OF CREDIT INSURANCE TO HER.
The other major UDAP violation and the secondary TILA violation alleged by the Debtor both center upon the Debtor's contention that, despite Mid-Penn's attempts to make it appear that borrowers have a choice, in fact it requires its customers to purchase credit life and disability insurance in connection with its loans generally and, in particular, its loans with the instant Borrowers. The Debtor also appears to contend that Mid-Penn violates UDAP by failing to disclose important terms of the insurance policies to its customers.
Although many of the relevant authorities have not been cited by either party, there is a small body of caselaw relevant to these issues. In Williams v. Blazer Financial Services, Inc., 598 F.2d 1371, 1374 (5th Cir.1979); and Anthony v. Community Loan & Inv. Corp., 559 F.2d 1363, 1369 (5th Cir.1977), the Fifth Circuit Court of Appeals (hereinafter "the 5th Circuit") considered the TILA issue raised here: whether a consumer who signed a portion of the contract stating that (s)he voluntarily purchased credit life and disability insurance could nevertheless argue that, since the insurance was automatically included in the contract without an affirmative request to purchase such insurance, the purchase of such insurance could be deemed "required" and hence must be included in the finance charge in the transaction. See 15 U.S.C. § 1605(b) (credit life and disability insurance may be excluded from the finance charge only if its purchase is not a factor in approval of credit and the borrower gives "specific affirmative written indication" of the desire to purchase such insurance after written disclosure of the cost of same). Cf. Brown, supra, 106 B.R. at 856-61 (failure to include an unauthorized official fee to record an assignment in the finance charge violates the TILA). However, in Williams and Anthony the 5th Circuit concluded that, where the borrower signed a statement stating that the purchase of insurance was voluntary, absent a claim of illiteracy, fraud or duress, no oral evidence could be admitted to prove that the lender *540 gave the borrower the impression the insurance was required. Cf. US Life Credit Corp. v. FTC, 599 F.2d 1387, 1389-90 (5th Cir.1979) (court reverses FTC holding that automatic inclusion of credit insurance in a loan contract without notification to consumers is effectively requiring insurance in violation of the TILA). The 5th Circuit hence consistently concluded that the respective borrowers' purchases of the insurance were voluntary and that TILA was not violated.
Somewhat less harsh was the reasoning of the Court in another TILA case, Mims v. Dixie Finance Corp., 426 F.Supp. 627, 631 (N.D.Ga.1976). There, while allowing the borrower to provide oral testimony regarding the condition of the insurance purchase despite the signed statement that the purchase was voluntary, the Court held that the borrower "must prove that the creditor specifically and unequivocally informed her that insurance is required in order to contradict the recital [in the contract] to the contrary." Id.
In a third TILA case, Fisher v. Beneficial Finance Co. of Hoxsie, 383 F.Supp. 895, 899-901 (D.R.I.1974), the court denied the borrower's motion for summary judgment based upon the claim that the choice to buy insurance was improperly disclosed, but allowed the borrower to prove, at trial, "that the defendant by its conduct, did actually require credit life and health insurance to be purchased as a condition of said loan contrary to the statement signed by the plaintiff in said insurance authorization form." Id. at 900.
The fourth relevant case is In re Dickson, 432 F.Supp. 752, 759 (W.D.N.C.1977). With respect to the TILA claim, the court there allowed that whether insurance was required "of course, is not conclusively established by the statement on the [TILA] disclosure [form] that it was not required, although this is some evidence of that fact." However, in the absence of any evidence from the borrower that insurance was required, the court rejected the TILA claim that the insurance purchase was not in fact involuntary in the factual circumstances before it.
Like the instant case, the Dickson factual matrix included the lender's concession that it received a liberal commission on the life insurance sold (twenty-five (25%) percent), which resulted in a finding by the Dickson court that the premium was twice as high as that considered adequate by the state Insurance Commission. Id. at 760-61. The court thus held that a state UDAP claim based on these claims was meritorious.
Results similar to those reached in Dickson were attained in Browder, supra. The court rejected a claim under a state law comparable to the TILA that the insurance purchased by the borrower was involuntary, 379 N.E.2d at 1213, 20 Ill.Dec. at 145, yet the court found that the borrowers did state causes of action based upon their allegations that the state UDAP was violated in that (1) the defendant retained forty (40%) percent of the insurance commissions, id. at 1212-13, 20 Ill.Dec. at 144-45; and (2) it failed to disclose the option of cheaper insurance to customers. Id. at 1210-12, 20 Ill.Dec. at 142-44. See pages 537-38 supra. Cf. Fitzgerald v. Chicago Title & Trust Co., 46 Ill.App.3d 526, 361 N.E.2d 94, 5 Ill.Dec. 94 (1977) (title company's allowance of ten (10%) percent of its fee to the institutions which ordered its report violated that state's UDAP).
At this point, we digress to discuss one of the puzzlements of this case. Despite her liberal invocation of UDAP, the Debtor does not raise any claim that Mid-Penn's retention of substantial commissions on its sales of credit life or disability insurance are violative of UDAP, a claim upheld in Dickson and Browder. Also, she does not undertake to prove that receipt of these commissions increased the costs of this insurance, although this appears to be a logical consequence of the imposition of such commissions. She also fails to argue that receipt of such commissions constitute improper finance charges, an argument seemingly more attractive than the TILA argument that she does in fact advance relative to Mid-Penn's sales of credit life and disability insurance, i.e., that the sale of insurance was required.
*541 Two decisions arguably support the Debtor's position that the instant insurance sales could be found to have been involuntary. In Kaminski v. Shawmut Credit Union, 494 F.Supp. 723, 729 (D.Mass.1980), a case heavily relied upon by the Debtor, the borrowers proved that, despite the statement in the TILA disclosure forms utilized by the lender that credit life insurance was not required, every customer of the lender under 70 years of age had purchased such insurance in connection with the making of a loan. Not only did the written contract state that insurance was not required, but the customers signed and dated a separate indication of a desire to purchase insurance. The court held that "notwithstanding the declaration to the contrary, each borrower under seventy years of age was required to buy life insurance as a condition of the extension of credit." Id. Consequently, the court concluded that the insurance charges were improperly excluded from the finance charges disclosed in the transactions and that TILA was violated therein. Id.
Also pertinent is that portion of the decision in In re Peacock Buick, Inc., 86 F.T.C. 1532, 1541 (1975), holding that an auto dealership which falsely informed its customers that credit life and disability insurance was required to be purchased when the installment sales contracts stated that such insurance was optional and customers signed a form acknowledging that it was optional constituted an unfair trade practice. But compare US Life, 599 F.2d at 1388-89.
We glean from Kaminski and Peacock the rule of law that, if a lender does in fact misrepresent to customers that insurance is required, even though the loan contracts unequivocally state that the purchase of insurance is optional, a violation of UDAP and TILA could be established. Therefore, we conclude that, contrary to the holdings in Williams and Anthony, a borrower should be permitted, by the borrower's own testimony or otherwise, to rebut the contents of a declaration, in a written contract, that the insurance purchase is not required. Even the execution of the separate "specific affirmative written indication" of a desire to purchase insurance required by 15 U.S.C. § 1605(b), should not, pursuant to the reasoning of Kaminski and Peacock, which we adopt, insulate the lender who misinforms its customers from liability.
However, having so concluded, we further hold that, in order for a borrower to succeed in a UDAP or TILA claim based on the theory that insurance is actually compulsory, the borrower is obliged to prove that (1) the lender affirmatively represented, by words or by conduct, that insurance was in fact required; and (2) as a result of the lender's actions, the borrower purchased insurance coverage that it is likely that (s)he would not have otherwise purchased.
In our view, the evidence presented by the Debtor as proof of these two requisite elements is too skimpy to merit a ruling in her favor. There is no evidence of affirmative verbal statements by any of Mid-Penn's agents that life and/or disability insurance was required. This is a distinct contrast from the copious convincing evidence that Griffith and the Mid-Penn loan closers did not explain the new loan as an alternative to refinancing.
The only evidence adduced by the debtor from Mid-Penn's agents which supported the conclusion that credit life and disability insurance purchases were required was as follows: (1) Such insurance was written into the loans even though the Borrowers did not affirmatively request it; (2) A very high percentage of Mid-Penn's customers (99.55%) purchased credit life insurance; and (3) At some undesignated date after the last of the Debtor's loans from Mid-Penn, Tench sent a memorandum to all Mid-Penn's loan closers stating, in its entire text, as follows:
DISCLOSURE PART I
LIFE AND A & H INSURANCE PREMIUMS MUST BE FULLY EXPLAINED TO ALL PARTIES.
DISCLOSURE PART II
BEFORE THE CUSTOMER SIGNS FOR LIFE AND A & H INSURANCE COVERAGE, WE MUST EXPLAIN AND BE *542 SURE THAT THEY ARE AGREEING TO LIFE AND A & H INSURANCE COVERAGE ON THE LOAN. THERE MUST BE NO DOUBT THAT THEY ARE AGREEING TO LIFE AND A & H INSURANCE COVERAGE.
The first element of evidence is of some probative value, but is hardly conclusive evidence, of the allegation that credit insurance was required by Mid-Penn. We recognize that borrowers are often overwhelmed when they are in the process of making loans and that they are therefore very susceptible to suggestions from lenders regarding inclusion of specific terms which are "recommended" by the lenders. As the court stated in Mims, supra, 426 F.Supp. at 632, "it is natural for anyone, . . . who wants to borrow money to be unwilling to displease the lender over a small matter." Nevertheless, the Mims court further observes that the borrower's assumption that credit insurance is required does not establish that the lender is requiring the borrower to purchase insurance. Id. This is particularly true, we believe, with respect to the instant Debtor, who went through the loan transaction procedure with Mid-Penn on six (6) occasions in a period of less than two years and never resisted the efforts of Mid-Penn to sell her such insurance.
Evidence that a very high percentage of Mid-Penn's customers purchase credit life insurance is also of probative value in the Debtor's attempt to establish that credit insurance was required by Mid-Penn. However, we are troubled that the record includes only the percentage of Mid-Penn's customers who purchased credit life insurance, and yet the Debtor attempts to assert, as a result, that both credit life and credit disability insurance were required to be purchased. We are also not prepared to conclude that purchasers of insurance by amount percentage of Mid-Penn customers less than one hundred (100%) percent renders the facts comparable to Kaminski. Requiring customers to purchase insurance would result in a one hundred (100%) percent figure, and anything less supports the opposite conclusion. We would need to know something about why credit life insurance was not sold to the small number of customers who did not purchase same before we could make a conclusive finding that Mid-Penn requires all feasible borrowers to purchase credit life insurance, let alone credit disability insurance.
The Tench memorandum is, we submit, entirely insignificant. It neither addresses or implies anything about Mid-Penn's past practices regarding inclusion of credit insurance in its contracts. On its face, it is, if anything, exculpatory regarding Mid-Penn's practices. We cannot and will not make the inference suggested by the Debtor: that the memorandum was deemed to be necessary to solve a problem regarding a propensity of Mid-Penn employees to require insurance prior to the issuance of the memorandum.
The cumulative effect of the evidence of Mid-Penn's practices as described in the mouths of its own employees could have resulted in a finding that Mid-Penn did in fact require credit insurance if it had been combined with strong evidence from the mouth of the Debtor which further supported the conclusion that insurance was, by acts or words of Mid-Penn's employees, effectively required. However, in this respect, the record is deficient. As we noted in Finding of Fact 23, page 529 supra, the Debtor was highly credible when describing the absence of explanation of loan terms, including no explanation of credit insurance included or of Mid-Penn's receipt of commissions, and of her inability to comprehend the terms of her loans. She was credible in stating that she was told to sign the portions of the form indicating that she voluntarily purchased insurance. However, the Debtor related no specific statements from any Mid-Penn personnel affirmatively stating or even strongly suggesting to her that insurance was required. We are therefore left with uncertainty as to whether the degree of Mid-Penn's actions was strong enough to permit us to conclude, in this record, that Mid-Penn affirmatively represented that purchases of credit life and disability insurance were required of its customers.
Establishment of whether the Debtor desired the insurance coverage provided is an *543 issue within the exclusive control of the Debtor and hence was her burden to establish. Mid-Penn would have had considerable difficulty proving the contrary had the Debtor provided convincing testimony that she did not want this insurance. However, when asked, by her counsel, the all-important question of whether she would have purchased such insurance if she had been told it was voluntary, the reply was a rather confused, "No, not really." The court followed up this question and answer by itself asking the Debtor whether she might not have wanted to purchase credit life and disability insurance to protect her mother-co-borrower from liability if the Debtor herself, the insured party, died or became disabled. The Debtor responded credibly, but not in a manner supportive of her own claims on this issue, that she had never thought about this.
Except for the last loan, made after her mother was deceased and no other individual to protect from liability was suggested, we believe that the Debtor most probably would have purchased credit life and disability insurance even if she had been given a clear choice as to whether to do so. Moreover, after having access to Mid-Penn's forms and practices and having received policies on six prior occasions as of the time of the last loan, we believe that the Debtor had, by that time, ample opportunity to question Mid-Penn's practices and voice opposition to unwanted coverage. There was no testimony that the Debtor ever expressed a desire not to purchase credit insurance to any Mid-Penn employee at any time.
We therefore conclude that, at least on this record, the burden of establishing that the credit insurance purchases made by the Debtor in the instant transaction were involuntary was not met by the Debtor. Such a finding is the linchpin of the Debtor's TILA argument on this score. A finding that the credit insurance was required was also the principle contention raised and argued by the Debtor in her claims that the sales of credit insurance to her in these transactions violated UDAP.[8]
The Debtor also articulates a secondary insurance-related UDAP claim: that Mid-Penn's agents failure to explain important terms of the insurance policies sold to her. The Debtor was apparently confused as to the rather basic issue of whether the insured party on the policies was her or her mother and who the beneficiaries were. However, on cross-examination, the Debtor quickly admitted that, through review of the policies, she ascertained, at least after the first loan, that she was the insured party. Furthermore, we note that, at one point, the Debtor changed the name of the beneficiary from her mother to her husband, Charles Milbourne. Therefore, it would appear that the Debtor had some understanding of the terms of the insurance policies, at least as far as the beneficiaries were concerned. Hence, we fail to find that Mid-Penn's lack of explanation of the policy terms rendered the Debtor confused to such an extent that this practice violated UDAP.
We therefore reject the Debtor's claims that Mid-Penn's practices in sales of credit insurance to her were violative of either the TILA or UDAP on the instant record.
I. THE DEBTOR HAS FAILED TO ESTABLISH THAT SHE SUFFERED ANY ACTUAL DAMAGES AS A RESULT OF MID-PENN'S TAKING MULTIPLE MORTGAGES AGAINST HER RESIDENCE, THUS PRECLUDING THE DEBTOR'S MAKING A SUCCESSFUL UDAP CLAIM ON THIS BASIS.
The Debtor devotes relatively little attention to a final UDAP claim that Mid-Penn's *544 retention of multiple mortgages against her residence was contrary to its representation that prior mortgages would be satisfied at the time of making each a new loan. The retention of multiple mortgages is, of course, the substantive basis of her lucrative successful TILA claims. See pages 530-33, supra. A violation of TILA may also constitute a violation of UDAP. See Nickel, supra, 26 D. & C.3d at 127-31.
However, the instant claim suffers from several glaring deficiencies. First, there is no evidence that any of Mid-Penn's agents ever informed the Debtor that prior mortgages would be satisfied when she refinanced the said loans. In light of the Commentary amendment of March 3, 1989, see page 531 supra, expressly stating that the taking of multiple mortgages need not be disclosed in Notices of rescission rights, at least to contracts entered into thereafter, we are most reluctant to conclude that a mere failure of Mid-Penn to inform the Debtor that multiple mortgages were taken by it against her property constitutes a disclosure violation under any law.
More importantly, the Debtor provided no evidence that she has suffered or will suffer any "actual damages" as a result of Mid-Penn's alleged misrepresentations regarding its taking of multiple mortgages, nor, we might add, as a result of the takings of the mortgages themselves. A showing of "actual damages" is a prerequisite of any successful cause of action under 73 P.S. § 201-9.2(a) of UDAP.
In Jungkurth, supra, 74 B.R. at 336, in discussing the "actual damages" requirement of this statute, we stated
that the analysis of "actual damages" under § 201-9.2(a) should be the same as that which we employed in interpreting 15 U.S.C. § 1640(a)(1) of the TILA in Russell, supra, at 863-64. Thus, a deceptive act should be penalized by a liberal measure of the reasonable consequences of the act to the wronged party.
In Jungkurth, we held that the plaintiffs' failure to quantify their damages caused by oppressive debt-collection practices did not preclude a finding that they were entitled to at least some damages. Id. at 335-36. See also In re Chapman, 77 B.R. 1, 6 (Bankr.E.D.Pa.1987) (uncertainty as to the correct measurement of damages does not prevent a recovery when the defendant's liability to the plaintiff in some amount is clear). Our holding that Mid-Penn is liable to the Debtor for failing to disclose to her the possibly more attractive options to refinancing in making additional loans, even when we were unable to accept the Debtor's own quantification of her actual damages, see page 539 supra, is consistent with this reasoning.
However, we did not doubt that the Jungkurth plaintiffs and the Debtor here, as to Mid-Penn's refinancing practices, suffered some actual damages as a result of the conduct which we found to have been violative of UDAP. By way of contrast, it is precisely such a doubt of any actual damages as a result of the instant practice that confronts us here. Especially in light of the fact that the Debtor has already harvested the elimination of Mid-Penn's claim and an affirmative recovery of $4,957.14 against Mid-Penn as a result of Mid-Penn's violations of the TILA in failing to adequately disclose its retention of multiple mortgages against the Borrowers' residence, we can scarcely conclude that the penalties imposed upon Mid-Penn as a result of these actions on its part is inconsequential.
Therefore, we shall not augment this award by adding, to the damages awarded to the Debtor for violations of the TILA arising from Mid-Penn's failure to disclose its taking of the said multiple mortgages, any sums for violations of UDAP as a result of this same practice. This claim is thus rejected.
J. CONCLUSION
An order consistent with the conclusions reached in this Opinion will be entered.[9]

*545 ORDER
AND NOW, this 14th day of December, 1989, upon consideration of the record made at the trial of this proceeding on July 25, 1989, and the post-trial submissions of proposed Findings of Fact, Conclusions of Law, and Briefs of the parties, it is hereby ORDERED AND DECREED that:
1. Judgment is entered in favor of the Plaintiff-Debtor, GLORIOUS MILBOURNE, a/k/a GLORIOUS DILLARD (hereinafter "the Debtor") on the First Claim set forth in her Complaint and in part only as to the Second Claim set forth in her Complaint against the Defendant, MID-PENN CONSUMER DISCOUNT COMPANY (hereinafter referred to as "Mid-Penn").
2. It is DECLARED that the Debtor properly exercised her right to rescind the transactions between the parties of April 11, 1985; August 29, 1985; September 17, 1985; and May 22, 1986, in issue pursuant to the TILA and that therefore these contracts are deemed RESCINDED.
3. The Proof of Claim filed by Mid-Penn in the Debtor's main bankruptcy case is disallowed in its entirety.
4. Mid-Penn is directed to satisfy any and all remaining mortgages which it has against the Debtor's residential real estate at 19 North 59th Street, Philadelphia, Pennsylvania 19139, within fifteen (15) days from the date of this Order.
5. Mid-Penn shall pay the sum of $4,957.17 as damages pursuant to 15 U.S.C. § 1640(a)(2)(A)(i), and $500 as damages pursuant to 73 P.S. § 201-9.2(a), to the Standing Chapter 13 Trustee, Edward Sparkman, Esquire. The said Trustee shall determine whether these sums or any part thereof may be claimed as part of the Debtor's exemptions, and, if they are, he shall forward the sums which are includable in her exemptions to the Debtor forthwith.
6. The parties are urged to attempt to agree upon reasonable attorneys' fees and costs which are due to the Debtor's counsel pursuant to 15 U.S.C. § 1640(a)(3) and 73 P.S. § 201-9.2(a). If this matter is not resolved within fifteen (25) days, the Debtor's counsel may, within thirty (30) days of this Order, file a Motion requesting such fees, said Motion to be procedurally in conformity with In re Meade Land and Development Co., Inc., 527 F.2d 280 (3d Cir. 1975); and In re Mayflower Associates, 78 B.R. 41 (Bankr.E.D.Pa.1987). However, if the Debtor's counsel has made a reasonable request for such fees which is refused, the said counsel may recover compensation for time spent on the fee application as well.
7. The hearing on Confirmation of the Debtor's Chapter 13 Plan of Reorganization in her main bankruptcy case remains scheduled on
TUESDAY, DECEMBER 19, 1989, at 10:00 A.M. in Courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.
8. No further continuances of the Confirmation hearing will be favored.
NOTES
[1] Throughout the pleading and briefing of this proceeding, the parties erroneously spelled the Debtor's present surname as "Millbourne." We have corrected this spelling throughout this Opinion.
[2] In addition to the cases cited in this Introduction and the TILA cases cited at page 530 infra, Mid-Penn was also the foil in several other important decisions of this court. In In re Jordan, 91 B.R. 673 (Bankr.E.D.Pa.1988), we carefully analyzed the issues of the burden of proof in objections to proofs of claim and the computation of late charges. This decision was appealed to the district court, but the appeal was rendered moot when the underlying main case was dismissed. In In re Klein, 106 B.R. 396 (Bankr.E.D.Pa.1989); and In re Ford, 84 B.R. 40 (Bankr.E.D.Pa.1988), we considered the parameters of a Chapter 13 debtor's right to cure defaults owed to Mid-Penn in light of Mid-Penn's objections that the Plans violated the terms of 11 U.S.C. § 1322(b). Ford was not appealed. In Klein, Mid-Penn appealed from an interlocutory Order of October 19, 1989, but subsequently withdrew its appeal after the Debtors refrained from objecting to an increased proof of claim filed prior to confirmation of the Debtor's Plan on November 21, 1989.
[3] Other terms of this and subsequent loans are set forth in the chart appearing at Finding of Fact 10, page 527 infra, and are not reiterated in this and the following narrative paragraphs.
[4] The impact of this latter contention is overcome by Mid-Penn's practice of retaining multiple mortgages for at least some period after a loan is made in any event. Somewhat more persuasive is Seave's observation that taking a new mortgage and satisfying the old mortgage  which is probably Mid-Penn's practice at this time  does cause Mid-Penn to lose the priority of its earlier mortgage.
[5] We make this point because it seems to us that the lenders could have argued that the deduction should be made from the gross amount received by the borrowers, i.e., the sum of the funds paid directly to the borrowers plus the costs of insurance and official fees imposed which are not part of the finance charge. See Finding of Fact 10, page 527 supra.
[6] It was these passages of the Tucker Opinion that apparently motivated Mid-Penn to file its misplaced recusal motion, based on the motion that this court had "pre-judged" its refinancing practices to be violative of UDAP in these passages of dictum. See page 525 supra.
[7] See page 544 infra, for a discussion of the "actual damages" requirement set forth 73 P.S. § 201-9.2(a) of UDAP.
[8] We note that the Debtor has not raised the arguments that: (1) The particular insurance sold to her was overpriced. This contention was successfully raised in Browder, supra; Robinson, supra; Fox, supra; and Ralph Williams, supra; (2) The collection of a substantial undisclosed commission, which was accepted from the insurers by Mid-Penn, unfair increased insurance costs. This contention was successfully advanced in Dickson, supra, as well as Browder, supra. These arguments were less ambitious and may have more easily have been proven than the difficult undertaking of establishing, contrary to the express terms of form which the Debtor signed without protest seven times, that credit insurance was required. See our expression of puzzlement as to why these issues were not raised at pages 540-41 supra.
[9] As we placed the final touches on this Opinion, Mid-Penn filed a Motion to Disqualify the Debtor's counsel, a civil legal services program, from continuing to represent the Debtor due to her alleged financial ineligibility for the program's free services. We would observe that "[n]o question of whether representation is authorized" under the Legal Services Corporation Act, pursuant to which the Debtor's counsel is funded, "shall be considered in, or affect the final disposition of, any proceeding in which a person is represented by a recipient or an employee of a recipient." 42 U.S.C. § 2996e(b)(1)(B). Therefore, the Motion to Disqualify Counsel cannot affect our issuance of this Opinion. It also appears, by reference to the same statute, that the Motion of Mid-Penn in this court is misplaced, and that its only recourse is through the administrative channels of the Legal Services Corporation.